Fred A. MAUCK, Director of Insurance, State of Illinois, as Liquidator for Fidelity General Insurance Company, Plaintiff,

v.

MADING–DUGAN DRUG COMPANY et al., Defendants.

No. 70 C 2151.

United States District Court, N. D. Illinois.

July 16, 1973.

Fred H. Bartlit, Frank Cicero, Jr., Roger L. Taylor, of Kirkland & Ellis, Chicago, Ill., for Simmons Group, defendant and cross claim defendant.

Howard Arvey, John J. Enright, Malcolm S. Kamin, of Arvey, Hodges & Mantynbrand, Chicago, Ill., for Texas Consumer Finance Corp., defendant and cross claim plaintiff.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the motion of certain defendants to dismiss the first and second cross-claims of Texas Consumer Finance Corporation.

The instant action arose out of the acquisition in December, 1968 of Fidelity General Insurance Company (hereinafter "Fidelity General") by a group of corporations and individuals, including the Mading-Dugan Drug Company, (hereinafter the "Mading-Dugan Group") and the subsequent liquidation of Fidelity General.

The instant suit is brought by the Illinois Director of Insurance, *qua* Liquidator of Fidelity General, and names as defendants the Mading-Dugan Group. The complaint alleges that the Mading-Dugan Group, subsequent to the acquisition of Fidelity General, removed assets from that Company through allegedly "unfair contracts" thereby causing the insolvency and subsequent liquidation of Fidelity General. The plaintiff claims this action by the defendants violated sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t. In essence, the complaint alleges that the Mading-Dugan Group acquired Fidelity General utilizing a boot-strap design. This type of boot-strap acquisition of an insurance company has been held to violate federal securities laws. Superintendent v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

The plaintiff in the instant complaint alleges certain facts, *inter alia,* which should be considered for the proper disposition of the instant motion:

1. Prior to December 31, 1968, Fidelity General was a multi-line casualty insurance company chartered in Illinois. It was a publicly traded corporation and its stock was owned by various individuals and corporations. On December 30, 1968, Mading Dugan Drug Company ("Mading-Dugan"), a corporation, purchased from a small group of controlling shareholders approximately 51% of the outstanding shares of Fidelity General at a price of $3.10 per share. After the consumation of this transaction, Mading-Dugan controlled a majority of Fidelity General's Board of Directors. (This Court notes that there is nothing in the complaint which indicates that the price paid per share was less than fair market value.)

Subsequent to its acquisition of 51% of Fidelity General, Mading-Dugan made a tender offer to purchase the remaining Fidelity General shares at $3.10 per share on or before July 30, 1969. In May of 1969, Mading-Dugan's interest in Fidelity General was transferred to Contran Corporation ("Contran"). Contran, or its nominees, completed the tender offer and acquired a substantial number of the remaining shares. After July 30, 1969, Contran completely controlled and dominated Fidelity General's Board of Directors. In all, Mading-Dugan and Contran (or its nominees) paid approximately $3.3 million for the shares of Fidelity General which they had acquired.

2. During times relevant to the complained-of activity, Mading-Dugan and Contran were affiliated directly or indirectly through the device of interlocking directors, dominated directors, substantial stock ownership, holding companies, or substantial identity of equitable control with each other and with a number of other companies including, inter alia: Dealers National Insurance Company ("Dealers National"); Liberty Universal Insurance Company ("Liberty Universal"); and Texas Consumer Finance Company ("Texas Consumer"). Defendant Harold Simmons ("Simmons") and others were, during time relevant to the complained-of activity, directors of both Fidelity General and one or more of the above mentioned related companies. Defendant Gilbert Goodman and others were, during times relevant to the complained-of activity, directors of Fidelity General under the domination and control of the interlocking directors mentioned hereinabove.

3. Shortly after December 31, 1968, defendants caused Fidelity General to sell approximately $6 million worth of municipal bonds for cash. With this cash, defendants then caused Fidelity General to purchase $3.7 million worth of securities consisting of stock, letter

stock, surplus debentures and subordinated debentures in the related companies mentioned hereinabove. The market and actual value of these securities was substantially less than the $3.7 million paid for them. The net result of these transactions was to give back to Mading-Dugan and Contran all of the cash expended in the original purchase of Fidelity General and in the July 30, 1969, tender offer. Thus, the complaint alleges, defendants purchased Fidelity General with no cash investment on their own part.

4. In August or September, 1969, defendants caused Fidelity General to enter into two agreements with Dealers National retroactive to June 30, 1969. Pursuant to these agreements, Fidelity General (1) transferred $1.9 million representing 35% of its loss reserves to Dealers National in exchange for Dealers National's assumption of 35% of all of Fidelity General's losses; and (2) transferred all of its previously acquired securities of the related companies carried at about $3.5 million, plus $2 million in cash to Dealers National in exchange for Dealers National's agreement to enter into an 80/20 reinsurance agreement with Fidelity General. At the time that these agreements were entered into, Dealers National claimed assets worth approximately $18 million consisting of letter stock of Contran and Mading-Dugan. The stock owned by Dealers National was not readily marketable to pay losses incurred in the ordinary course of its own insurance business; further, Dealers National was grossly short of cash and inadequately reserved to pay its own anticipated loss expenses. The complaint alleges that the defendants knew that Dealers National would be unable to perform its agreement to reinsure Fidelity General.

5. In November of 1969, or January of 1970, the defendants, with actual knowledge that Texas Consumer was insolvent and would soon be placed in bankruptcy, caused Dealers National

to exchange its stock in Contran and Mading-Dugan for letter stock in Texas Consumer. In all, Dealers National acquired approximately 3,220,000 shares of an authorized issue of 3,455,000 shares of Texas Consumer. This newly acquired stock was carried as an asset of Dealers National at approximately $5.00 per share because the defendants caused Dealers National to maintain a market in Texas Consumer stock by publicly buying the stock on the open market when the stock was offered at less than $5.00 per share. A substantial number of these Texas Consumer shares bought on the open market were not recorded in Dealers National's books. The Texas Consumer stock owned by Dealers National was not readily marketable to pay losses incurred by Dealers National in the ordinary course of its insurance business. Accordingly, the complaint alleges that this exchange of Mading-Dugan and Contran letter stock for Texas Consumer stock further depleted the financial condition of Dealers National and virtually assured the fact that it would be placed in liquidation.

6. As a result of the above transactions, the defendants divested from Fidelity General, Dealers National, Texas Consumer and other financial and insurance companies a solvent and profitable drug store and clothing business; this solvent business was retained by other corporate and individual defendants for their own benefit. By the time this divestiture was completed, some $11 million in cash had been taken directly or indirectly from Fidelity General and used by defendants in their other business ventures. Once the fraudulent scheme had finished, the defendants gave control and ownership of Fidelity General, Dealers National, Texas Consumer and other defunct financial and insurance companies to their employees.

7. As a result of the above alleged transactions, Texas Consumer filed a voluntary reorganization petition under Chapter 11 of the Bankruptcy Act in August of 1970, and Fidelity General, Dealers National and Liberty Universal were all placed in liquidation by their domicile states.

The defendant Texas Consumer, in response to the Second Amended Complaint has filed a cross claim against defendants Harold Simmons, individually and as trustee; Williams Drug Company; Mading-Dugan Drug Company; Contran Corporation; Wards Drug Company; Wards Cut-rate Drug Company; Mading-Dugan Drugstores, Inc.; Clyde Campbell Companies, Inc.; and Glen R. Simmons (hereinafter jointly referred to as the "Simmons Group").

The first cross-claim asserts that if Texas Consumer is liable to Fidelity General, then the Simmons Group must be liable to Texas Consumer because it was they who caused the conduct complained of in the complaint. More specifically, Texas Consumer alleges in the cross claim that it was one of the several companies whose stock and assets were shuffled about by the Simmons Group as they looted companies for their own gain.

The second cross-claim is based upon the alleged violations by the Simmons Group of the Securities Act of 1933, the Securities Exchange Act of 1934, and the "applicable principles of state law". As the basis for the second cross-claim, Texas Consumer alleges the following facts, *inter alia:*

1. In January of 1970 the person controlling Texas Consumer (i. e., the Simmons Group) caused it to enter into written agreements with Dealers National Insurance Company and Liberty Universal Insurance Company whereby Texas Consumer agreed to purchase agents' balances and premium notes of said companies. Between January and June 1970, pursuant to this agreement, Texas Consumer purchased agents' balances and premium notes of said companies in an aggregate amount of approximately $3,450,000.

2. The agents' balances and premium notes so purchased were virtually

worthless and Texas Consumer recovered thereon, prior to its fits filing in bankruptcy an aggregate amount of $278,000.

3. Texas Consumer would not have entered into said agreements or purchased said agents' balances and premium notes but was caused to do so by the persons so dominating and controlling Texas Consumer (the Simmons Group) in an attempt by such persons to create an appearance of solvency in Dealers National Insurance Company and Liberty Universal Insurance Company and to delay the then inevitable liquidation of such companies. As a result of this conduct Texas Consumer was looted and divested of a substantial portion of its assets and was forced to file a petition in bankruptcy.

The defendants and cross-claim defendants (the Simmons Group) in support of their motion to dismiss the cross-claims contend:

1. Colonial Commercial Corporation, the owner of Texas Consumer and the real party in interest and beneficiary to any recovery, was not a shareholder of Texas Consumer at the time of the alleged improper transactions.

2. Texas Consumer has released the cross-defendants from any liability.

3. The first cross-claim seeking indemnification fails to allege any legal basis for indemnification.

Texas Consumer, the cross-claim plaintiff, in opposition to the instant motion contends that it has stated proper cross-claims against the Simmons Group.

It is the opinion of this Court that the instant motion is without merit.

I. TEXAS CONSUMER IS A PROPER PLAINTIFF TO THE INSTANT CROSS-CLAIM SEEKING DAMAGES FROM THE PERSONS WHO ALLEGEDLY CAUSED INJURY TO IT

■ The instant motion asserts that Colonial Commercial Corporation ("Colonial") was not a shareholder of Texas Consumer at the time of the wrongs complained of and, accordingly, should be barred from instituting a derivative or class action on its own behalf under the "contemporaneous ownership" doctrine of state law and Rule 23.1 of the Federal Rules of Civil Procedure. Texas Consumer contends that it is clear that the cross-claim is an action by Texas Consumer on its own behalf and that the "contemporaneous ownership" doctrine is specifically limited to shareholder's suits which are derivative in nature.

The deposition of Mr. Bernard Korn, President of Colonial, the present owner of Texas Consumer's stock, demonstrates that the cross-claims asserted by Texas Consumer herein were among the assets of Texas Consumer at the time of such acquisition (Korn Dep. taken March 9, 1973 pp. 79–80, 84–86). Texas Consumer had certain contingent liabilities at the time of said acquisition, including and not limited to the instant litigation. Texas Consumer also had pending certain claims in its favor and, in fact, specific reference to many of such claims was made in the course of the negotiations for the acquisition of Texas Consumer and in the closing documents.

When Colonial acquired Texas Consumer, it acquired a corporation which had rights and liabilities. It did so knowingly, it valued and balanced the rights and the liabilities and it elected to purchase stock not assets. Claims of the nature asserted by Texas Consumer in the instant cross-claims allegedly existed and were considered by Colonial at the time of the acquisition.

■ The doctrine of "contemporaneous ownership" does not apply to a suit which is brought by the corporation itself to enforce its own rights. Central Ry. Signal Co. v. Longden, 194 F.2d 310 (7th Cir. 1952). See also Overfield v.

Pennroad, 48 F.Supp. 1008 (E.D.Pa. 1943).[1] It is clear to this Court that Texas Consumer has brought this action and may properly maintain this action to enforce its corporate rights.

## II. THERE HAS NOT BEEN AN EFFECTIVE RELEASE OF THE SIMMONS GROUP FROM THE CONSEQUENCES OF THEIR ALLEGED WRONGFUL ACTS

The Simmons Group contends that in accordance with the terms of its Chapter 11 Plan of Arrangement approved by the Bankruptcy Court, Texas Consumer released Dealers National and Liberty Universal from any liability arising from the transaction alleged in the cross-claims and the effect of this "broad and general" release is to release all other joint tort-feasors including the cross-claim defendants (the Simmons Group).

All of the acts alleged in the cross-claim allegedly took place in Texas; the release in question was executed and delivered by a Texas corporation, in Texas, and related primarily to events which occurred in Texas. Texas Consumer released only the Receiver, Dealers National and Liberty Universal from claims which Texas Consumer had arising out of or with respect to any acts or circumstances existing between Texas Consumer and Dealers National, Liberty Universal or the Receiver. The claims asserted against the Simmons Group were reserved and excluded from the express terms of the release.

The effect of the release is governed by the law of Texas, the state which has the most significant relationship to the transaction in question. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Manos v. Trans World Airline, Inc., 295 F.Supp. 1166 (N.D.Ill.1968), and Ingersoll v. Klein, 46 Ill.2d 42, 262 N.E.2d 593 (1970). In Texas, a release operates to release only the persons named therein. McMillen v. Klingensmith, 467 S.W.2d 193 (Tex. Sup.1971). See also Leong v. Wright, 478 S.W.2d 839 (Tex.Civ.App.1972).

Thus the cross-claim defendants have not been effectively released from liability.[2]

## III. THE SIMMONS GROUP MAY BE LIABLE TO TEXAS CONSUMER FOR CLAIMS RAISED AGAINST TEXAS CONSUMER WHICH WERE CREATED BY THE SIMMONS GROUP'S WRONGDOING

It is alleged in the cross-claim that the Simmons Group controlled Texas Consumer and caused it to enter into numerous transactions including those complained of by Fidelity General. If these alleged transactions did result in liability to Texas Consumer then it

---

1. The cross-claim defendants cite Bangor and Aroostock Railroad Co. v. Bangor Panta Operations, Inc., 1973 CCH Sec. L.Rep. par. 93,706 (D.Me. Jan. 2, 1973). It is the opinion of this Court that the *Bangor* case is both factually and equitably distinguishable from the instant action.

2. Texas Consumer alleges that the Simmons Group was primarily responsible for the wrong done to it, Dealer National, Liberty Universal and the other financial and insurance interests. Even in Illinois, the state whose law the Simmons Group contends is applicable, a release given to a party which may have been secondarily responsible for a portion of the wrong does not release the party primarily responsible for the entire wrong. Cereal Byproducts Co. v. Hall, 16 Ill.App.2d 79, 147 N.E.2d 383 (1st Dist., 1958) affirmed, 15 Ill.2d 313, 155 N.E.2d 14 (1959). The complaint and cross-claims are clear that many of the injuries caused by the Simmons Group did not involve Dealers National or Liberty Universal, and particularly not Contran's wrongful sale of Fidelity General stock to Texas Consumer. (Paragraphs 36–49 of the counterclaim and cross-claim.) The Simmons Group, Dealers National and Liberty Universal cannot be joint-tortfeasors for the purpose of "unity of release" doctrine. Thus the release cannot be an effective release of the Simmons Group under Illinois law.

would be just and proper that the Simmons Group indemnify Texas Consumer against such liability. The law of Texas, the state of the most significant relationship to the cross-claim provides for indemnification in such cases. Austin Road Co. v. Pope, 147 Tex. 430, 216 S.W. 563 (Texas Sup.1949); Frantom v. Neal, 426 S.W. 268 (Tex.Civ.App., 1968). See generally Gusheer v. Kalen, 449 F.2d 1276 (10th Cir. 1971) and Security Insurance Co. of New Haven v. Johnson, 276 F.2d 182 (10th Cir. 1960).

The law of Illinois is in concurrence with that of Texas which allows indemnification in cases similar to the instant cross-claim. United States v. State of Illinois, 454 F.2d 297 (7th Cir. 1971), cert. denied 406 U.S. 918, 92 S.Ct. 1767, 32 L.Ed.2d 117 (1972); Miller v. DeWitt, 37 Ill.2d 273, 226 N.E.2d 630 (1967); Mullins v. Crystal Lake Park District, 129 Ill.App.2d 228, 262 N.E.2d 622 (2nd Dist. 1970). Thus the Simmons Group's contention that Texas Consumer's first cross-claim fails to allege a basis for indemnification is without merit.

Accordingly it is hereby ordered that the cross-claim defendants' motion to dismiss the cross-claims is denied.