REA EXPRESS, INC., Plaintiff,

v.

The TRAVELERS INSURANCE COMPANY et al., Defendants.

Civ.A.No. 2141–71.

United States District Court, District of Columbia.

Feb. 2, 1976.

---

Arthur M. Wisehart, New York City, John M. Cleary, Donelan, Cleary & Caldwell, Washington, D. C., for plaintiff REA Express, Inc.

Sullivan & Cromwell, William Piel, Jr., Michael M. Maney, Mark I. Fishman, New York City, Seymour & Patton, Thomas E. Patton, Washington, D. C., for defendant the Travelers Ins. Co.

Edwin M. Zimmerman, Covington & Burling, Washington, D. C., for Railroad defendants.

Francis M. Shea, Shea & Gardner, Washington, D. C., for defendants National Railway Labor Conference and Eastern Carriers Conference Committee.

## MEMORANDUM AND ORDER

WILLIAM B. JONES, Chief Judge.

In this action, REA Express, Inc. [REA] has sued Travelers Insurance Company [Travelers], twenty-two railroad companies [railroad defendants], the National Railway Labor Conference [NRLC], the Eastern Carriers' Conference [ECC], and the Eastern Carriers' Conference Committee [ECCC]. Counts I and II allege, respectively, violations of Section 10 of the Clayton Act, 15 U.S.C.

§ 20 (1970), and Section 1 of the Sherman Act, 15 U.S.C. § 1 (1970). Counts III through IX allege common law causes of action based on breach of fiduciary duty, unjust enrichment, wrongful interference with business relations, and breach of contract. REA has moved for partial summary judgment with respect to the issue of defendants' liability under Section 1 of the Sherman Act for alleged price-fixing. The railroad defendants, the ECCC and the NRLC have jointly moved for summary judgment with respect to the entire case. Travelers has separately moved for complete summary judgment. Finally, ECCC and NRLC have moved for summary judgment with respect to Counts III through IX, the common law claims. The various motions now pending before the Court raise numerous issues with respect to the various defendants' liability. Those motions have been fully briefed and the Court has heard argument of counsel. The Court need not reach the merits of those issues, however, since one threshold issue —REA's standing in equity to sue these defendants—is dispositive of REA's complaint.

## BACKGROUND

In January 1929, substantially all the railroads in the United States joined to form the Railway Express Agency, now REA Express, Inc., to conduct the railway express business in this country. The railroads accomplished this result by purchasing all the assets of the sole express agency then operating, the American Railway Express Company, and transferring these assets to the newly formed REA. All of the capital stock in REA was sold to 85 participating railroads, and operating agreements were executed between REA and the railroads using the express service. These agreements provided that REA would be the exclusive express agency of the railroads and that annual revenues of REA, after deduction of operating expenses, would be distributed to the railroads executing the operating agreements in proportion to their express business. On February 11, 1929, the ICC approved in certain respects this arrangement. 150 ICC 423 (1929).

Until June 1968, all the capital stock in REA continued to be owned by the various railroads. Moreover, while the agreement for division of earnings had been modified or replaced between 1929 and 1968, the sole beneficiaries of REA's earnings were the railroads.

In June 1968, in order to prepare for sale of REA, the stockholding railroads deposited their stock in a voting trust. The voting trustees took over formal management of REA in June, and continued in such position until the sale of REA's stock on August 21, 1969. The stock was sold to the REA Holding Corporation, which was formed by a group of REA executive officers who had been employed by the voting trustees in 1968 and 1969. The Holding Corporation presently owns more than 99 per cent of the REA stock.

## DISPUTED TRANSACTIONS

Between 1929 and June 1968, the Board of Directors of REA consisted of officers or directors of various of the stockholding railroads. Although REA's complaint is framed in a number of different legal theories involving both federal and common law causes of action, at bottom it is a typical suit seeking recovery for waste and mismanagement by the Board of Directors. REA challenges two transactions undertaken by the REA Board in 1956 and 1968. In 1956, the Board approved REA participation in GA 23000, then a health insurance policy written by Travelers and held by the railroads for the benefit of their employees. REA was directed to participate at a premium rate which was identical to the rate paid by all other participating railroads. REA claims that this uniform premium provision denied it the benefit of a higher experience rating [1] which it allegedly enjoyed. To force REA's par-

---

1. An experience rating measures the safety record of employees over a period of time. REA claims that its employees enjoyed a bet- ter safety record than the employees of other railroads, which should have reduced the rates payable by REA.

ticipation in GA 23000 at this uniform premium rate, according to REA, constituted illegal price-fixing, waste, and mismanagement. Further, REA claims that the railroad defendants violated Section 10 of the Clayton Act by failing to require competitive bidding before awarding the insurance contract to Travelers.

In 1965, GA 23000 was amended to provide life insurance benefits. It is REA's contention that those benefits vested immediately in employees who were covered by the plan and later retired, a contention which Travelers and the railroad defendants disputed in 1968. Therefore, in March 1968, the railroads and REA, acting at the behest of the Board and through its agent, the ECCC, approved Amendment 16 to GA 23000, which provided that life insurance benefits did not vest in the retired employees, and that such benefits would lapse if any participant withdrew from the policy. Since certain REA officers had previously voiced their intention to seek REA's withdrawal from GA 23000, REA contends that this action constituted illegal monopolization by Travelers of the railroad insurance market, as well as waste and mismanagement by the REA Board.

REA withdrew from participation on March 31, 1968, except as to a small number of employees represented by the International Association of Machinists.[2] It claims that Amendment 16 has forced it to seek life insurance for its 4,000 retired employees to replace the allegedly vested benefits they enjoyed prior to approval of the amendment.

### REA'S STANDING IN EQUITY TO SUE

With one exception to be addressed later, the factual posture of this case is almost identical to that in *Bangor Punta Operations v. Bangor & A. R. Co.,* 417

U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). There the Supreme Court held that the plaintiff had no standing in equity to sue, a result which this Court feels compelled to reach in this case as well.

In *Bangor Punta,* the following factual setting was presented. In 1964, Bangor Punta acquired through a subsidiary 98.3% of the stock of the Bangor and Aroostook Railroad. It thereafter controlled and directed the railroad until 1969, when it sold its entire stock interest to the Amoskeag Company. Then in 1971, the railroad filed suit against Bangor Punta and its predecessor in interest for mismanagement, misappropriation, and waste of the railroad's assets during the period of Bangor Punta's ownership of the railroad. Damages were also sought for violations of Section 10 of the Clayton Act and Section 10 of the Securities and Exchange Act.

Without analyzing the merits of any of the railroad's claims, the Court immediately framed the issue as Amoskeag's[3] standing in equity to sue Bangor Punta for violations of the Clayton Act and Securities and Exchange Act during Bangor Punta's term of ownership:

> The resolution of this issue depends upon the applicability of the settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions.

417 U.S. at 710, 94 S.Ct. at 2583. Amoskeag could not point to any injury which it had suffered. All of the acts complained of had occurred during the term of Bangor Punta's ownership; there were no allegations that Amoskeag had been misled or defrauded in its purchase of the railroad or received less

---

**2.** REA finally withdrew as to these employees on June 1, 1972.

**3.** Although the named plaintiff was the railroad, the Court stated that "Amoskeag, the principal beneficiary of any recovery and itself estopped from complaining of petitioners' al-

leged wrongs, cannot avoid the command of equity through the guise of proceeding in the name of respondent corporation which it owns and controls." 417 U.S. at 713, 94 S.Ct. at 2584.

than the true value of its purchase; and there was no showing that the alleged wrongful acts had a continuing effect on the railroad or on the value of Amoskeag's stock. As the Court summarized, "In other words, Amoskeag seeks to recover for wrongs Bangor Punta did to *itself* as owner of the railroad." 417 U.S. at 712, 94 S.Ct. at 2584.

Based upon these facts, the Court found Amoskeag without standing in equity to sue. Since Amoskeag owned 98.3% of the railroad's stock, and would receive any recovery in the railroad's name, the Court further held that the railroad had no standing to sue. Particularly persuasive to the Court in reaching this decision was the realization that Amoskeag, if it were to recover, would have purchased the railroad at its fair value and in addition would have received a windfall for injuries which presumably were reflected in the purchase price. 417 U.S. at 712, 716, 94 S.Ct. 2578.

The Court of Appeals had upheld Amoskeag's standing to sue in the name of the railroad. It focused on the benefit which would accrue to the public from enforcement of the antitrust and securities laws. The Supreme Court expressly rejected this as a consideration which could overcome equity's aversion to unjust enrichment. The Court stated in footnote 13:

> The dissent argues that respondents' complaint is based on federal antitrust and securities statutes and that such laws are designed in part to benefit the public. With that much we agree. But the statutory design has not been effectuated through the indiscriminate provision of causes of action to every citizen. Rather, these statutes create specifically defined legal duties to particular plaintiffs and vest the appropriate causes of action in them alone. Here, the statutorily designated plaintiffs are respondent corporations. But, as we have stated, these plaintiffs cannot maintain the present action because a recovery by Amoskeag would

violate the established principles of equity.
417 U.S. at 716–17, 94 S.Ct. at 2586 n. 13. The clear thrust of the Court's opinion is that the unjust enrichment which would benefit Amoskeag precludes it—or its wholly-owned subsidary—from recovering, regardless of the public interest involved.

The Court further found that the equitable principle which precluded Amoskeag's recovery based on the federal causes of action likewise precluded recovery on the common law causes of action, since Maine recognized the validity of that principle. 417 U.S. at 714, 94 S.Ct. 2578.

REA's situation is identical to that of the railroad in *Bangor Punta,* with one exception that will be addressed later. The REA Holding Corporation owns, as did Amoskeag, over 98% of REA's stock, which it had purchased from the defendant railroads in 1969. REA has alleged no fraud or deceit in the sale to the Holding Corporation. Indeed, the Holding Corporation was the corporate instrumentality for the new management group which entered the REA structure when the railroads established the voting trust to sell REA, and REA does not dispute that the group knew as well as anyone the value of REA. Moreover, the two acts complained of, the uniform premium provision of the 1956 insurance contract and the alleged divesting of retired employee life insurance benefits embodied in Amendment 16, were inflicted by the railroads on their wholly owned subsidiary REA during their ownership of REA. If these transactions harmed anyone, they harmed the railroads. The allegedly higher premiums would ultimately affect the income of the railroads as stockholders, and the railroads would have been required to maintain the Travelers policy after Amendment 16 if they wished to continue their retired employees' life insurance benefits.

■ That the railroad defendants anticipated selling REA when Amendment 16 was adopted is immaterial since the

Holding Corporation through the new management group had full knowledge of both transactions, as well as the effect on REA. There are no allegations that this effect was not a factor in the purchase price, or that the railroad defendants failed to disclose the transactions; hence the Court must assume that the purchase price reflected REA's true value. To allow the Holding Corporation, through REA, to recover, would permit the Holding Corporation to purchase REA for its true value and then receive additional "compensation" for damage to REA which was previously reflected in the purchase price. Such a result is clearly condemned by the *Bangor Punta* Court:

> The equitable principles of *Home Fire* preclude Amoskeag from reaping a windfall by enhancing the value of its bargain to the extent of the entire purchase price plus an additional $2,000,000. Amoskeag would in effect have acquired a railroad worth $12,-000,000 for only $5,000,000. Neither the federal antitrust or securities laws nor the applicable state laws contemplate recovery by Amoskeag in these circumstances.

417 U.S. at 716, 94 S.Ct. at 2585.

 Delaware law applies to REA's common law claims asserted in Counts III through IX of its complaint, since it is the state of REA's incorporation. See *Weiss v. Kay Jewelry Stores, Inc.,* 152 U.S.App.D.C. 350, 359, 470 F.2d 1259, 1268 (1972). Delaware recognizes the same equitable principle articulated in *Bangor Punta.* See *Goodman v. Futrovsky,* 42 Del.Ch. 468, 213 A.2d 899, 903 (Sup.Ct.1965). Therefore REA's common law claims cannot be maintained for the reasons stated above. See 417 U.S. at 713–14, 94 S.Ct. 2578.

 REA attempts to escape the *Bangor Punta* doctrine in several ways. First, REA claims that *Bangor Punta* is inapplicable to this case because it involves allegations of price-fixing, which are *per se* violations of the antitrust laws. While a *per se* violation of the antitrust laws was not involved in *Ban-*

*gor Punta,* the Court's clear emphasis on equity's aversion to unjust enrichment as the basis for its holding renders irrelevant the nature of the antitrust violation. Second, REA attempts to apply the intra-enterprise conspiracy doctrine of antitrust law to this case. That doctrine holds that an agreement between a parent corporation and its subsidiary can constitute a combination or conspiracy under the antitrust laws. See *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116–117, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). Even assuming that a Sherman Act or Clayton Act violation could be established by REA through the use of the intra-enterprise conspiracy doctrine, however, the equitable principle established by the *Bangor Punta* Court would preclude recovery by REA. 417 U.S. at 716–17, 94 S.Ct. 2578 n. 13. The court was not concerned with the nature or method of the antitrust violation; it was the unjust enrichment of Amoskeag (here, REA Holding Corporation) which denied the railroad (here, REA) standing in equity to sue. Thus, applicability of the intra-enterprise conspiracy doctrine is irrelevant. Third, REA argues that since in the instant case several railroads, rather than one parent corporation as in *Bangor Punta,* inflicted the injury on the subsidiary, *Bangor Punta* is inapposite. As noted earlier, the Court's rationale is avoidance of unjust enrichment; it did not focus on the defendant's conduct or corporate structure. Whether there be one or several parent corporations is simply irrelevant to the *Bangor Punta* doctrine.

Fourth, REA attempts to distinguish *Bangor Punta* by proffering a "continuing wrong" exception. In *Bangor Punta,* the Court noted, "Nor does it appear that the alleged acts of prior mismanagement have had any continuing effect on the corporations involved or the value of their shares." 417 U.S. at 711, 94 S.Ct. at 2583. The Court did not elaborate on this apparent exception to the rule it enunciated, and the railroad defendants argue that the exception does not and should not exist since it would "swallow the rule." See also *Bangor &*

*Aroostook R. Co. v. Bangor Punta Operations, Inc.,* 353 F.Supp. 724, 727 n. 1 (D.Maine 1972). Whether the exception is indeed valid need not be decided since there are no facts to support its application. If there is any continuing injury, it has flowed from Amendment 16, which forced REA to continue paying the allegedly higher premiums or lose all life insurance benefits for its retired employees. If REA has had to pay higher premiums to reestablish these benefits after its withdrawal from the policy on March 30, 1968, it is not alleged anywhere that the purchase price—agreed to August 20, 1969—did not reflect this increased liability. In short, any wrong inflicted by the railroad defendants through Amendment 16 was known to the Holding Corporation and should have been reflected in a lower purchase price. The railroad defendants were injured thereby, not the Holding Company.

Fifth, and perhaps most troubling, REA argues that the interests of the REA employees and creditors make *Bangor Punta* inapplicable. The caption of the complaint asserts that REA sues in its own capacity and on behalf of its employees. Moreover, REA was adjudicated a bankrupt on November 6, 1975, so that any recovery in this lawsuit would first inure to the benefit of the estate, and be distributed ultimately to the creditors of REA.

Even if REA had not been adjudicated bankrupt, the remote interest of the employees in any recovery would not justify excepting REA from application of the *Bangor Punta* doctrine. A similar argument was made in *Bangor Punta* that Amoskeag could use its recovery to benefit the public. The Court rejected this argument as a basis for granting Amoskeag standing to sue because "there is no assurance that the public would receive any benefit at all from these funds." 417 U.S. at 715, 94 S.Ct. at 2585. Similarly here, there is no assurance, whether bankrupt or not, that REA would use its recovery to benefit its employees.[4]

Nor can the more immediate interests of the creditors justify REA's exemption from the *Bangor Punta* doctrine. To be sure, the Supreme Court observed in a footnote, in response to an argument by Justice Marshall in dissent, that the railroad had not brought the action on behalf of creditors, and that the financial health of the railroad was "excellent." 417 U.S. at 718, 94 S.Ct. 2578 n. 15. The extent and importance of this observation is unclear and undeveloped. It is this Court's opinion, however, that an exception to *Bangor Punta* should not be made on the facts of the case presented.

First, this suit is not brought on behalf of creditors. It is only because of REA's recent bankruptcy that the creditors now pose a prominent interest. Surely, if the pending motions had been argued and decided prior to November 6, 1975, the date of bankruptcy, there would be no question that *Bangor Punta* would require dismissal of this action. The illogic of allowing REA to recover now only serves to underscore the artificiality of an exception to *Bangor Punta* which would permit a corporation to recover only if it became bankrupt during the pendency of the proceeding. It cannot be gainsaid that the creditors would benefit from a recovery by REA; but the creditors of Amoskeag in *Bangor Punta* would also have benefited, their position being strengthened by the increased financial stability of Amoskeag. Moreover, counsel for REA at oral argument did not know of any instance of a creditor (other than the railroad defendants) who had a debt outstanding prior to the change of ownership in 1969. Since that time, any creditor would have or should have been fully apprised of the financial condition of REA. To that extent, the creditors in the instant case stand in the same shoes as the Holding Corporation which purchased REA, and

4. Although REA asserts that it has "implicit authorization" from the unions representing employees to sue on behalf of the employees, there is no binding agreement that REA use the money it would recover for the benefit of the employees.

Amoskeag in *Bangor Punta*.[5] Both the post-1969 creditors and the Holding Corporation had knowledge of the financial condition of REA when entering into their respective transactions, and to allow them to now recover more than the value of the bargain they freely entered would clearly constitute unjust enrichment.

In short, REA has not shown any injury which accrued to anyone but the railroad defendants. To allow REA, the Holding Corporation, or REA's creditors, to recover for wrongs inflicted by the defendants on themselves, would clearly be unjust enrichment and cannot be permitted under the doctrine of *Bangor Punta*.[6]

In light of the foregoing, it is this 2nd day of February, 1976

Ordered that the motions of Travelers, the railroad defendants, the NRLC, and the ECCC for summary judgment be and the same hereby are granted; and it is

Further ordered that plaintiff's complaint be and the same hereby is dismissed with prejudice.

---

**5.** Pre-1969 creditors, to the extent that they had been wronged by actions of the REA board after entering into the credit arrangement with REA, might have a stronger interest if they were before this court. Whether a recovery would be appropriate even in that instance need not now be decided, since, as noted earlier, this is not a creditors' suit, and no pre-1969 creditors other than the railroad defendants have any interest in REA's assets.

**6.** Travelers and the conference defendants, of course, cannot be held liable, either, since the basis of *Bangor Punta* is avoidance of unjust enrichment, not deterrence of allegedly illegal or improper conduct. See 417 U.S. at 717, 94 S.Ct. 2578.