**SUMMIT NATIONAL LIFE INS. CO.**

v.

**CARGILL, INC.**

**Civ. A. No. 89–8574.**

United States District Court,
E.D. Pennsylvania.

April 20, 1992.

Joseph M. Donley, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, for plaintiff.

Edward J. Pluimer, Dorsey & Whitney, Minneapolis, MN, Mitchell S. Pinsly, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for defendant.

## MEMORANDUM

O'NEILL, District Judge.

## I. INTRODUCTION

This is a diversity action. Defendant Cargill, formerly the sole shareholder of plaintiff Summit, sold all of the issued and outstanding stock of Summit to SNL (formerly Virick Limited II) in 1988. Summit

---

brought this action against defendant alleging the breach of a Tax Allocation Agreement that had been entered into by Summit and Cargill on or about July 13, 1983. Cargill moved for summary judgment on the grounds that (1) plaintiff's action was barred by *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) and (2) that the Tax Allocation Agreement was settled prior to the sale of Summit. I referred both motions to Magistrate Judge M. Faith Angell for Report and Recommendation which she has submitted. The Report recommends that summary judgment be entered in favor of Cargill. Summit has filed lengthy objections to the report which Cargill has answered.[1]

I have reviewed the Magistrate's Report and Recommendation and the parties' submissions. For the reasons set forth below, I will approve the Report to the extent that it is consistent with this Memorandum and adopt the Recommendation that judgment be entered against Summit.

## II. DISCUSSION.

The parties do not contest most of the Report's recitation of the facts and therefore a brief summary is sufficient. In late 1981 and early 1982, while a wholly-owned subsidiary of Cargill, Summit generated significant tax deductions by making a one-time election under 818(c) of the Internal Revenue Code to revalue its life insurance reserves using $19/1000 reserve level for its graded premium ordinary life insurance policies. On or about July 13, 1983, Summit and Cargill entered into a federal tax payment allocation agreement, under which Cargill agreed to compensate Summit for the tax benefits it conferred on Cargill.

Separately, the parties agreed to file a consolidated return for each of the fiscal years ending May 31, 1983 and subsequent. *See* Report at 2 and n. 5.

Cargill used tax deductions produced by Summit's 818(c) election, calculated at $19/1000, for the years ending May 31, 1984 through May 31, 1987. Under the formula set forth in the Tax Allocation Agreement, Cargill's total benefit for the tax years 1983 to 1987 was $131,388,504.00. For the calendar years 1983 through 1987, Summit recognized $47,239,127.00 as income from Cargill under the tax agreement. This amount is the value of deductions generated by Summit using a reserve level of $5/1000.

On or about December 30, 1987, Summit transferred $84,149,377.00 to Cargill by means of an interdepartmental voucher. This sum represents the difference between the total financial benefit to Cargill resulting from Summit's 818(c) deductions at the $19/1000 level and the tax refund paid to Summit by Cargill using a reserve level of $5/1000. On or about June 29, 1988, Summit and Cargill executed a Termination Agreement to terminate the Tax Allocation Agreement. Cargill sold all of the issued and outstanding stock of Summit to SNL for $52,000,000.00 in October 1988.

### A. Settlement of the Tax Allocation Agreement

The Report and Recommendation relies on affidavits submitted by Cargill to conclude that "officers of Summit and Cargill, claiming proper authorization, agreed to settle their obligations under the Tax Allocation Agreement prior to the sale of Summit." Report at 18.[2] Summit concedes that the Report "accurately recites ... the

---

1. Summit filed its objections to the Magistrate's Report and Recommendation on September 12, 1991. Cargill filed its response to Summit's submission on September 26, 1991 and Summit filed a reply brief on October 4, 1991 and a supplemental reply on November 13, 1991. Cargill filed another response on November 26, 1991. Summit filed an supplemental brief on February 18, 1992 to which Cargill responded on March 5, 1992.

2. Cargill's two summary judgment motions are based on the independent grounds that *Bangor Punta* precludes Summit's action and that the Tax Allocation Agreement was settled prior to the sale. Judge Angell addressed both grounds but treated settlement and its disclosure to SNL as reasons for concluding that *Bangor Punta* applied to this case. Report at 14–18; 26–27. I find, however, that I need not reach the issue of whether the agreement was settled in order to grant Cargill's motion for summary judgment.

factual history of the transfer of monies from Summit to Cargill through the use of an Interdepartmental Voucher" but argues that the Report usurped the jury's function by concluding that Summit's transfer of $84,149,377.00 constituted a settlement of the Tax Allocation Agreement. Summit National Life Insurance Company's Objections to the Report and Recommendation at 4–6.

The parties stipulated that there is no written agreement which purports to settle obligations owing under the Tax Allocation Agreement and that the Termination Agreement does not specifically provide for release or forgiveness of the tax allocation agreement. Stipulation of Undisputed Material Facts Nos. 18, 21. The parties also stipulated that Summit's Board of Directors did not pass resolutions authorizing a settlement, release or termination of the Tax Allocation Agreement. Stipulation No. 25. Nor did Summit's Board specifically authorize the Summit representatives involved in the transfer to settle or compromise any amounts due Summit under the agreement. Stipulation No. 14.

Summit contends that in the absence of written evidence of a settlement, any alleged settlement must be the result of an oral modification to the Tax Allocation Agreement. Summit relies on *Barnhart v. Dollar Rent a Car Systems, Inc.*, 595 F.2d 914 (3d Cir.1979), in which the Court of Appeals for the Third Circuit, construing Pennsylvania law, held that " 'where there is a dispute as to which set of several circumstances, some expressed in writing and some oral, constitute the agreement between the parties it is the jury's function and not the court's to determine which set of circumstances constitutes the true agreement.' " *Id.* at 918 (quoting *Gilbert v. Safeguard Mutual Insurance Co.*, 345 F.Supp. 732, 734 (E.D.Pa.1972), *aff'd.*, 481 F.2d 1398 (3d Cir.1973)). The Court held that the "allegation of an oral modification or waiver of the written condition precedent was sufficient to convert the interpretation of the true agreement into a question of fact." *Id.; see also First National Bank v. Martenies*, 1989 WL 111762, 1989 Ohio App. LEXIS 3736 (Ohio App. Sept. 29,

1989) (question of whether contract has been modified hinges upon intent of parties and is decided by the factfinder).

In its responsive submissions, Cargill does not attempt to address Summit's objection that the issue of whether the Tax Allocation Agreement was orally modified should be determined by the factfinder. Rather, Cargill argues that Summit has not presented any evidence to contradict the evidence submitted by Cargill establishing that the intercompany accounts related to the tax agreement were finally settled prior to the closing. Defendant Cargill Incorporated's Response to Plaintiff's Objections at 6. Summit has not submitted affidavits containing assertions of its intent in making the transfer to Cargill but points out that there is no evidence of the corporation's intent to settle, *e.g.*, minutes of Summit's Board of Directors. Cargill contends that there was no need for a written settlement between Summit and Cargill because *Bangor Punta* holds that a parent corporation is free to control its wholly-owned subsidiary's assets and dispose of them as it sees fit since any injury to the wholly owned subsidiary is actually an injury to the parent. Defendant Cargill's Response to Plaintiff's Objections at 6. Under *Barnhart* and *First National Bank of Toledo*, the question arises whether I may determine on this motion whether Summit and Cargill intended to modify or settle the Tax Allocation Agreement by the transfer of $84 million from Summit to Cargill. I do not decide this question, however, because this dispute may be disposed of on other grounds.

**B. The *Bangor Punta* doctrine**

SNL paid $52 million for plaintiff Summit. Summit originally argued that defendant Cargill owed Summit in excess of $80 million under the Tax Allocation Agreement but now claims that the correct amount may be between $19 and $34 million, depending upon at what level the IRS eventually permits Cargill to settle the 818(c) deductions. *See, e.g.*, Amended Complaint ¶ 24 (seeking $65 million); Response of Summit National Life Insurance

Company in Opposition to Defendant Cargill's Motion for Summary Judgment at 9 (seeking $80 million); Summit National Life Insurance Company's Supplemental Brief in Opposition to Cargill's Motion for Summary Judgment at 4 (seeking in excess of $84 million); Summit's Objections to the Report at 14–15.

In its first summary judgment motion, defendant Cargill claimed that even if Cargill did owe Summit money, because Summit's owner bought all the stock of Summit from Cargill, because the owner of Summit did not own any of Summit's stock at the time the wrongs alleged in the amended complaint occurred, and because this action, if successful, would result in unjust enrichment of Summit's new owners, the claims in the amended complaint are barred by the doctrine of *Bangor Punta,* 417 U.S. 703, 94 S.Ct. 2578. Cargill argues that under *Bangor Punta* all of the claims in the amended complaint would be barred if brought by the party purchasing the stock of Summit (SNL); accordingly, they may not be pursued in the name of the corporation purchased (Summit).

Summit responds that *Bangor Punta* is not applicable because this is an action at law by Summit to recover corporate assets (monies due Summit from Cargill for benefits it received from Summit pursuant to the Tax Allocation Agreement) and not a proceeding in equity by its shareholders to recover for mismanagement. Further, Summit argues that the Termination Agreement does not relieve Cargill from its obligation to pay monies due and owing for the period prior to termination.

In *Bangor Punta,* relying upon *Home Fire Ins. Co. v. Barber,* 67 Neb. 644, 93 N.W. 1024 (1903), the Supreme Court held that a stockholder who has purchased all or substantially all the shares of a corporation from a vendor at a fair price may not seek to have the corporation recover from the vendor under the federal antitrust and se-

curities laws or state law for prior corporate mismanagement.

In *Home Fire,* Commissioner Roscoe Pound announced the doctrine "that it would be inequitable to permit new stockholders to obtain a windfall recovery of a large part of their purchase price by bringing suit in the corporate name against prior management for its alleged misappropriations notwithstanding that the stock was worth all they paid for it and that they obtained all they bargained for." *In re REA Express, Inc. Private Treble Damage Antitrust Litigation,* 412 F.Supp. 1239, 1243 (E.D.Pa.1976) (summarizing holding in *Home Fire*).

As Judge Becker has observed, the *Home Fire* decision:

> rested on three interrelated and largely overlapping equitable principles: (1) the 'tainted shares' doctrine, which precludes a shareholder from complaining of acts of corporate mismanagement if his transferor participated or acquiesced in the wrongdoings; (2) the contemporaneous ownership rule, which requires that the plaintiff have been a shareholder at the time of the alleged wrongful acts ... and (3) the inequity of permitting shareholders who had acquired a very large part of their interest through the very acts of management complained of and who had paid a fair market value to recover back their purchase price, *i.e.,* to prevent the new shareholders from reaping a windfall by in effect obtaining a corporation for nothing.

*National Union Elec. Corp. v. Matsushita Elec. Industrial Co.,* 498 F.Supp. 991, 996 (E.D.Pa.1980).[3] Judge Becker explained that the weakness in the *Bangor Punta* plaintiff's position was that it would receive the benefit of its bargain plus recovery from the former parent:

> Thus, the windfall in the Court's own terms arises when [current parent] enhances the value of its bargain, *i.e.,* when it recovers *back* from the defen-

---

**3.** It is important to note that the Supreme Court explained but did not rely on the contemporaneous ownership rule in *Bangor Punta, see National Union Electric,* 498 F.Supp. at 1000 (citing *Bangor Punta,* 417 U.S. at 708, n. 4, 94 S.Ct. at

2582, n. 4), and that Judge Becker stated in *National Union Electric* that the rule was relevant to a suit brought by a corporation "only insofar as it incorporates ... notions of 'wind-

dant the consideration that it admits fairly reflected the value of the shares. To this extent we think the holding of the Court is dependent on the identity of the defendant, not so much because it will have to pay twice (although that would be the practical effect of a ruling in plaintiff's favor) but because permitting plaintiff in effect to attack its bargain and recover back its consideration while keeping the benefits of that bargain is the sort of conduct that shocks the conscience of the court and requires disregard of the corporate fiction to prevent. *Id.*, 498 F.Supp. at 1002 (emphasis in original).

There are similarities and dissimilarities between this case and the *Bangor Punta* type cases. The most striking similarity is the fact that SNL, the owner of Summit, will reap a windfall if Summit prevails because SNL will have paid $52 million dollars and received all of the stock of Summit plus $19 to $84 million dollars paid to Summit, which SNL wholly owns.[4] Another similarity to *Bangor Punta* is that the present suit is brought by the purchased company, which was not a party to the stock purchase agreement, rather than by its owner, which was a party. There is no evidence as to whether SNL paid and Cargill received a fair price for the Summit stock. However, I agree with the Magistrate Judge that there is no direct allega-

tion that Summit was worth less that its purchase price and Summit has not contested this finding. *See* Report at 25. On the other hand, Summit does not appear to be asserting that Cargill engaged in wrongful acts during the time that it owned Summit, and the suit seeks recovery of what could be characterized as a receivable of Summit.[5]

The *Bangor Punta* decision stands for the proposition that the current parent of a corporation may not sue the former parent for mismanagement of that corporation where there has been no allegation that the corporation was not worth the purchase price and, therefore, the corporation may not maintain the suit in its own name. *Bangor Punta* is also authority for the position that "the court must ignore the corporate fiction when the equities of the case so require." *National Union Electronic*, 498 F.Supp. at 1006. I need not decide whether *Bangor Punta* applies to this case in all respects, however, because I find that Summit's claim is barred by the application of general principles of contract law informed by the equitable principles of *Bangor Punta*.

The most striking dissimilarity to the *Bangor Punta* line of cases is that in the present situation SNL and Cargill expressly recognized the existence of the Tax Allo-

---

fall' or unjust enrichment." 498 F.Supp. at 1001.

4. Summit objects to the Report's piercing of the corporate veil in part because it contends that SNL would not be the only beneficiary of a potential recovery in this case. Specifically, Summit contends that its policyholders may be injured by a lack of recovery in this case if at some future date Summit is sanctioned under Ohio insurance law for failure to collect from Cargill or if the IRS at some point determines that Summit is liable for a tax deficiency resulting from the deductions produced by Summit's 818(c) election or if Cargill is found liable to the IRS and sues Summit for contribution. *See, e.g.,* Response of Summit In Opposition to Defendant Cargill's Motion for Summary Judgment at 23–24. I agree with the Report's finding that such fears are speculative and do not present a genuine issue of material fact precluding summary judgment. Report at 26, n. 35.

5. Summit has not attempted to distinguish *Bangor Punta* on the grounds that the Supreme

Court was applying federal law and Maine law in that case, neither of which apply to this case. Where, as here, there does not appear to be a conflict of laws between the states whose law potentially would control, however, there is no need to reach the choice of law issue. *See Knowlton Co. v. Knowlton,* 10 Ohio App.3d 82, 10 OBR 104, 460 N.E.2d 632 (Ohio App.1983) (applying *Bangor Punta* and Ohio state case based on the same equitable principles); *Weston v. Reading Co.,* 445 Pa. 182, 282 A.2d 714 (1971) (applying *Home Fire*); *Atlantis Plastics Corp. v. Sammons,* 1988 WL 32371, 1988 Del.Ch. LEXIS 44 (Del.Ch. March 30, 1988) (applying *Bangor Punta* and Delaware state cases based on the same equitable principles); and *Transamerica Ins. Co. v. Federal Deposit Ins. Corp.,* 465 N.W.2d 713 (Minn.App.1991) (applying *Bangor Punta* ); *see also Aeronca, Inc. v. Style–Crafters, Inc.,* 499 F.2d 1367 (4th Cir.1974) (in diversity action not involving Maine law, distinguishing *Bangor Punta* without reference to federal/state law distinction).

cation Agreement and provided for it in their written contract of purchase and sale.

Article V of the Stock Purchase Agreement of May 2, 1988, contains the covenants of the parties. Section 5.11 thereof (page 49) provides as follows:

5.11 *Settlement of Intercompany Accounts.* All intercompany accounts, including those related to taxes of any kind or character, as between the Company [Summit] on the one hand, and Seller [Cargill] or any of its affiliates on the other, shall be finally settled, compromised or paid in full on or prior to the closing Date except as otherwise specifically provided herein. The tax sharing agreement between Seller and the Company shall be canceled on or before the Closing, and no payments shall be made under such agreement after the Closing.

Article III of the agreement sets forth the representations and warranties of the seller, and section 3.07 seller's representations and warranties with respect to Summit's financial statements. Item 2 on Schedule 3.07 to section 3.07 of the agreement provides as follows:

2. The Company followed a conservative position with respect to section 818C deductions, reporting a tax savings of $2.50/1000 on its GAAP books. Based on settlements reached by other insurance companies with the IRS, a Section 818C reserve at a $5/1000 level is realistic, but still conservative. In December, 1987, Seller and the company settled payments due under their tax sharing agreement at the $5/1000 level. Therefore, the Company will adjust its GAAP books to reflect a tax savings of $5/1000, which will add approximately $14,869,000 to the Company's fiscal 1988 earnings.

Moreover, the Termination Agreement of June 29, 1988, between Cargill and Summit provides in part as follows:

A. Cargill and Summit are parties to a Federal Tax Allocation Agreement, dated July 13, 1983, a copy of which is attached hereto as Exhibit A ("Tax Agreement");

B. Cargill and Virick Limited II, an Illinois corporation ("Virick"), have entered into an agreement, dated May 2, 1988, pursuant to which Cargill has agreed to sell all the issued and outstanding shares of the capital stock of Summit to Virick or its assignee ("Stock Purchase Agreement"), and as a result thereof, Cargill and Summit desire to terminate the Tax Agreement.

NOW, THEREFORE, the parties hereto intending to be legally bound hereby, agree as follows:

1. The Tax Agreement shall terminate, effective as of the close of business, on that date which is the Closing Date as defined in the Stock Purchase Agreement; provided however, if the Closing Date does not occur on or prior to October 31, 1988, this Agreement shall be deemed void and of no further effect.

2. This Agreement has been executed and delivered by the parties with the understanding such may not be rescinded or amended without the prior written consent of Virick, and copies hereof may be provided by Virick to those governmental authorities from whom an approving determination of the transactions contemplated by the Stock Purchase Agreement is required or deemed desirable by Virick.

Summit does not dispute the Report's finding that a copy of the Termination Agreement was delivered to SNL and its attorneys prior to closing. Report at 20.

Given these provisions, I believe that the issues raised by Cargill's motions can and should be resolved by application of principles of contract law although the equitable principles articulated in *Bangor Punta* are not wholly inapplicable. Specifically, *Bangor Punta* permits the disregard of the corporate fiction "when the equities of the case so require." *National Union Electric*, 498 F.Supp. at 1006; *see Home Fire*, 93 N.W. at 1033 ("if the stockholders have no standing in equity, and are not equitably entitled to the remedy sought to be enforced by the corporation in their behalf

and for their advantage, the corporation will not be permitted to recover.").[6]

SNL purchased Summit with knowledge of its financial statements, the accuracy of which was warranted by Cargill. No expert testimony is needed to establish that these statements were highly material to the transaction. Summit does not claim that the amounts allegedly due under the Tax Allocation Agreement were listed as an asset or carried as a receivable in the financial statements.

When SNL executed the Stock Purchase Agreement in May, 1988, section 5.11 thereof informed SNL of the existence of the Tax Allocation Agreement, that it would be canceled on or before closing, that any amount due thereunder would be finally settled, compromised or paid in full on or prior to the closing and that no payments were to be made thereunder after closing. On or after June 29, 1988,

SNL and its attorneys received a copy of the Termination Agreement, which provided that the Tax Agreement would terminate on the closing date if that date occurred prior to October 31, 1988.

Thus, whether or not the Tax Allocation Agreement was in fact settled, Summit's parent company SNL participated in the closing under an agreement which provided that "no payments shall be made under [the tax sharing] agreement after the Closing." Under the law of any jurisdiction, the language of this contract is unambiguous. Although the claimant in this action is Summit and not its parent SNL, SNL's determination to bring this action in the name of its wholly-owned subsidiary should not permit it to avoid the consequences of a contract it freely undertook to enter.

The decisions relied on by Summit in arguing that the Report should be rejected and summary judgment denied because Summit and not SNL is the plaintiff in this

**6.** Summit correctly asserts that the Court in *Home Fire*, a 1903 decision, distinguished a proceeding in equity, in which the court should disregard the corporate entity if the equities so require, from a proceeding at law, "or where [a corporation] is asserting a title to property," in which "the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them." *Home Fire*, 93 N.W. at 1033; *see e.g.*, Response of Summit National Life Insurance Company in Opposition to Defendant Cargill Incorporated's Motion for Summary Judgment at 15–16. Federal Rules of Civil Procedure Rule 2 abolished the procedural distinction between law and equity. *See e.g., National Union Electric*, 498 F.Supp. at 999 n. 11.

To the extent that Summit's argument is substantive rather than procedural, the Supreme Court and other federal courts have determined that equitable concepts such as unjust enrichment may preclude even actions "at law." Summit's argument is based on *Home Fire*, in which the Court relied on the law/equity distinction in holding that the corporate form should be observed in an action by a corporation to recover, among other monies, the interest on a loan. In *Bangor Punta*, however, the Supreme Court relied on the equitable principles of *Home Fire* to disregard the corporate form in a case where plaintiff sought, *inter alia*, interest on a loan. Indeed, most of the claims in *Bangor Punta* were legal claims. *Bangor Punta*, 417 U.S. at 706–07, 94 S.Ct. at 2580–81 (state and federal antitrust laws); *see In re REA Express, Inc.*, 412 F.Supp. 1239 (E.D.Pa.1976) (applying equitable principles of *Bangor Punta* to antitrust claims); *REA Express, Inc. v. Travelers Ins. Co.*, 406

F.Supp. 1389, 1394 (D.D.C.1976), *aff'd. in part and modified in part*, 554 F.2d 1200, 1201 (D.C.Cir.), *cert. denied*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977) (affirming dismissal of federal antitrust claims under *Bangor Punta*). I therefore will not adhere to the rigid distinction made in the earlier decision between an action at law and an action in equity; the equities in this case favor disregarding the corporate form.

Summit relies on *Aeronca Inc. v. Style Crafters Inc.*, 499 F.2d 1367 (4th Cir.1974), which does not support its position. In that decision, the Court permitted the buyer of a corporation to proceed with its action against the seller for monies the buyer contended were due under an intercompany account between the seller and the purchased corporation. The discrepancy was not discovered by the purchaser until after the sale. The Court in *Aeronca* reversed the district court's grant of summary judgment against the buyer because "the conflicting claims represent not a shareholder's derivative action, but a dispute between a buyer and a seller over the purchase price of a chattel and the value of the chattel sold." *Aeronca*, 499 F.2d at 1374. There is no such dispute over the purchase price here. Summit does not contest the Report's finding of no direct allegation that Summit was worth less that its purchase price. Report at 25. Indeed, Summit's contention that if it is permitted to recover from Cargill, Cargill would be able to sue SNL under the Stock Purchase Agreement for an adjustment in the purchase price appears to be an implicit concession that the price paid for Summit by SNL was fair. *See e.g.*, Summit National Life Insurance Company's Objections to the Report at 13–14.

action are unpersuasive. In *Minpeco S.A. v. Conticommodity Services Inc.*, 549 F.Supp. 857, 859 (S.D.N.Y.1982) the Court declined to pierce the corporate veil of Minpeco which was wholly owned by Peru. In that case, however, the Court based its decision in part on its determination that "at least on the present record, we find no inconsistency between form and economic substance." 549 F.Supp. at 859. By contrast, there is such an inconsistency in this case as SNL would be unjustly enriched if Summit were permitted to recover. *National Union Electric*, also relied on by Summit, is distinguishable for similar reasons. In that case, the Court found that the equities did not favor disregard of the corporate identity of plaintiff, a wholly owned subsidiary, because the defendants were not the former owners of the plaintiff company and therefore there was no risk of unjust enrichment. *National Union Electric*, 498 F.Supp. at 1002–03 (*Bangor Punta* holding is "dependent on the identity of the defendant ... because permitting plaintiff in effect to attack its bargain and recover back its consideration while keeping the benefits of that bargain is the sort of conduct that shocks the conscience of the court and requires disregard of the corporate fiction to prevent").[7]

Summit relies on *Aeronca*, 499 F.2d 1367, to argue that a corporation should be exempted from rules applicable to derivative actions when pursuing a direct action to recover corporate monies. *See e.g.*, Response of Summit National Life Insurance Company in Opposition to Defendant Cargill at 15–19 (also citing *Home Fire*); *see supra* n. 6 (for distinction between law and equity). *Aeronca*, however, turned on the determination that the contemporaneous ownership rule did not apply to direct actions by corporations. *See also supra* n. 6 (distinguishing *Aeronca* on other grounds). Summit's reliance on *Aeronca* is misplaced because Cargill's submission is that this action is barred by the equitable concept of unjust enrichment rather than by the contemporaneous ownership rule. *See e.g.*, Defendant Cargill Inc.'s Reply Memorandum in Support of its Motion for Summary Judgment at 8–11; *National Union Electric*, 498 F.Supp. at 1000–01 (holding that contemporaneous shareholder rule does not apply to suits by a corporation but "recognizing its relevance only insofar as it incorporates ... notions of 'windfall or unjust enrichment' ").[8]

Summit argues that a corporation should not be prevented from pursuing a corporate cause of action simply because ownership of the corporation has changed hands. *See e.g.*, Response of Summit at 19–21 (relying on *National Union Electric* and *Mauck*, 361 F.Supp. at 1318–19). In *Mauck*, the Court refused to put aside the corporate fiction both because the contemporaneous ownership rule does not apply to direct actions by a corporation and because the claims asserted by the purchased corporation in *Mauck* were referred to and considered by the purchaser at the time of the acquisition. *Mauck*, 361 F.Supp. at 1318–19. Similarly, in *National Union Electric*, Judge Becker held that because the corporation's lawsuit was ongoing at the time of the purchase, the corporation's new owners "contemplated that the lawsuit would accompany the corporation when it changed

---

7. *Goebert v. Ondek*, 384 Pa.Super. 100, 557 A.2d 1064 (Pa.Super.1989), also relied on by Summit, is inapposite. The Court in *Goebert* was construing a Pennsylvania statute which Summit concedes is not involved in this case but which it claims is analogous to an Ohio statute which Summit claims might be relevant to this case. *See* Supplemental Brief of Summit National Life Insurance Company in Support of its Objections, Dkt. No. 42, Exh. B. In its Amended Complaint, Summit makes no claims pursuant to the Ohio statute, which provides that "[a]ctions may be maintained by an insurance company formed under the laws of this state, against any of its members, officers, policyhold-

ers, or stockholders, for any cause relating to its business...." Ohio Insurance Code § 3907. Nor does the statute include former parent companies of insurance companies. As this case does not concern either the Pennsylvania statute construed in *Goebert* or the Ohio statute which Summit contends is analogous to the Pennsylvania statute, Summit's reliance on *Goebert* is misplaced.

8. To the extent that *Mauck v. Mading–Dugan Drug Co.*, 361 F.Supp. 1314 (N.D.Ill.1973) stands for the same proposition as *Aeronca*, it is distinguished for the same reasons.

hands" and therefore that equitable considerations did not require disregard of the corporate entity. 498 F.Supp. at 1004.[9]

In contrast, the lawsuit in this case was not ongoing at the time SNL purchased Summit. Indeed, Summit concedes that prior to the sale to SNL it would not have sued Cargill "given that Cargill controlled Summit." Response of Summit at 22.[10] Nor is it likely that the lawsuit was contemplated or considered by SNL at the time of the purchase since SNL and Cargill provided explicitly in the Stock Purchase Agreement that the tax accounts would be settled prior to the closing. Neither *National Union Electric* nor *Mauck* supports Summit's argument.

*National Union Fire Insurance Co. v. Continental Illinois Corp.*, 666 F.Supp. 1180 (N.D.Ill.1987) is not to the contrary. In that case, the Court permitted FDIC as the new majority shareholder in Continental Illinois Corporation (CIC) to pursue direct claims against the former directors and officers of CIC which had been assigned by CIC to the FDIC as part of the bailout deal. *National Union Fire Insurance*, 666 F.Supp. at 1195–97. Unlike the situation here, the Court held the concept of unjust enrichment was not applicable because the assignment of the direct claims was part of the consideration for the FDIC's assumption of the Bank's debt. *Id.* at 1197. There is no contention in this case that SNL paid consideration for any claims by Summit against Cargill. More importantly, in this case Summit concedes that "SNL, the shareholder, would have no right to bring this action on the Tax Allocation Agreement in its own name." Summit National Life Insurance Company's Objections to the Report and Recommendation at 9, n. 7.

**9.** In *National Union Electric* the defendant conceded that if the new owners paid any consideration for the lawsuit the purchased corporation would be entitled to pursue it. 498 F.Supp. at 1005. The Court then found that a material issue of fact existed as to whether consideration had been paid for the lawsuit. *Id.* at 1012.

**10.** As in *Bangor Punta,* "[a]n action brought by the [purchased corporation] prior to the sale

### III. CONCLUSION

I will approve the Report to the extent that it is consistent with this Memorandum and adopt the Recommendation that defendant Cargill's motion for summary judgment be granted.

would have been an action against itself, for the injury suffered by the [purchased corporation] was coextensive with the injury suffered by the wrongdoers." *National Union Electric,* 498 F.Supp. at 1003. Judge Becker continued: "In such circumstances it makes no sense to adhere to the corporate fiction, for as a practical matter the corporation has not suffered any cognizable injury." *Id.*