**NATIONAL UNION ELECTRIC CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD. et al.**

**In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.**

Civ. A. No. 74–3274.
M.D.L. No. 189.

United States District Court,
E. D. Pennsylvania.

June 3, 1980.

Blank, Rome, Comisky & McCauley by Edwin P. Rome (argued), William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for National Union Elec. Corp., plaintiff.

Whitman & Ransom by Patrick H. Sullivan (argued), Dugald C. Brown, James S. Morris, Kevin R. Keating, Michael S. Press, New York City, Pepper, Hamilton & Scheetz by Charles J. Bloom, Philadelphia, Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., and Sanyo Elec. Trading Co., Ltd., defendants.

Mudge, Rose, Guthrie & Alexander, New York City, Drinker, Biddle & Reath, Philadelphia, Pa., for the Toshiba defendants.

Metzger, Shadyac & Schwarz; Tanaka, Walders & Ritger, Washington, D. C., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for the Hitachi defendants.

Weil, Gotshal & Manges, New York City, Morgan, Lewis & Bockius, Philadelphia, Pa., for the Matsushita defendants.

Reid & Priest, New York City, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Mitsubishi Corp. and Mitsubishi Intern. Corp., defendants.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for the Sony defendants.

Wender, Murase & White, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for the Sharp defendants.

EDWARD R. BECKER, District Judge.

## I. *Preliminary Statement*

This opinion addresses yet another motion for summary judgment interposed by defendants in this massive antitrust case. The present motion raises the question whether plaintiff, National Union Electric Corporation (NUE) has standing to maintain the action. While, because of the prominence of co–plaintiff Zenith Radio

Corporation in the American television market, the case is often referred to as "the Zenith case," Zenith did not enter the litigation until 1974. Rather, suit was first instituted by NUE, on December 21, 1970.[1] In its complaint NUE, the successor to Emerson Radio Corporation, one of the pioneers in the radio and television industry, alleged that its television business was destroyed as the result of a mammoth conspiracy perpetrated by defendants and others to sell television sets in the United States at artificially low prices.

After NUE ceased manufacturing television sets in 1970, its principal lines of commerce were air conditioners and vacuum cleaners. Following the death in December, 1973, of C. Russell Feldmann, Chairman of NUE and its controlling stockholder, the executors of his estate decided to sell its interest in NUE, since the estate was obligated to various banks for large sums of money under loans made prior to Mr. Feldmann's death.[2] One of the companies expressing interest in NUE was a large Swedish manufacturer of vacuum cleaners, Aktiebolaget Electrolux (Electrolux). In July, 1974, Electrolux made a cash tender offer for one hundred percent of the outstanding shares of NUE at $28 per share. Through acceptance of the tender offer and a subsequent Delaware "freeze–out merger" effected at the same $28 per share figure, Electrolux became, on August 1, 1975, the owner of all the outstanding stock of NUE, and the sole ultimate beneficiary of any recovery in this action.[3]

Based upon the extensive pretrial discovery record addressed to this issue, defendants submit that the $28 per share price paid by Electrolux represented the fair value of the assets and potential sales and earning power of NUE and that in negotiating to acquire NUE, Electrolux was motivated solely by a desire to enter the American vacuum cleaner market. While conceding that Electrolux was well aware that NUE owned, as a chose in action, this major lawsuit, defendants maintain that NUE placed no dollar value on the lawsuit, and that in fact nothing "extra" was paid for it. Under these circumstances defendants contend that, viewed in the light of a pierced corporate veil, any recovery by NUE in this action would amount to a pure "windfall" to Electrolux. Consequently, they argue, under the equitable doctrine announced by the United States Supreme Court in *Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) (*Bangor Punta*), described in detail *infra*, summary judgment should be entered dismissing the complaint of NUE because Electrolux has sustained no harm by virtue of defendants' conduct and hence NUE, as its wholly owned subsidiary, lacks standing to sue.[4]

In defendants' view:

[t]he essence of the *Bangor Punta* decision is the recognition by the Court that it is inequitable for a corporation to recover damages in circumstances (1) where

---

1. The litigation is described generally in our opinion addressed to the subject matter jurisdiction motion; that opinion also catalogues the numerous summary judgment motions. *See* 494 F.Supp. 1161 (E.D.Pa.1980).

 The present motion is interposed on behalf of the following defendants: Sanyo Electric Co., Ltd., Sanyo Electric Trading Co., Ltd., Sanyo Electric Inc.; Toshiba Corp., Toshiba America, Inc.; Hitachi, Ltd., Hitachi Kaden Hanbai Kabushiki Kaisha, Hitachi Sales Corp. of America; Matsushita Electric Industrial Co., Ltd., Matsushita Electric Corp. of America; Mitsubishi Corp., Mitsubishi International Corp., Sony Corp., Sony Corp. of America; Sharp Corp., and Sharp Electronics Corp.

2. Together with various members of his family, Mr. Feldmann owned at the time of his death

approximately forty–two percent of the outstanding NUE common stock.

3. Ninety–two percent of NUE's shares were acquired as a result of the tender offer and the eight percent balance as the result of the merger. In December, 1975, Electrolux contributed all the stock of NUE to another wholly–owned Electrolux subsidiary, Dometic, Inc. The parties have treated Electrolux as the sole owner of the NUE stock, and, at least for purposes of the conclusions herein, we do not regard the transfer of shares to Dometic as relevant.

4. For purposes of this motion only, the conduct complained of is admitted, and we treat NUE's allegations of antitrust violations as true throughout this opinion.

the present shareholder had no interest in the corporation at the time of the alleged wrongs, (2) where the present shareholder has not been injured by any of the wrongs done to the corporation and (3) where the present shareholder has not paid anything of value for the right to seek redress for the past wrongs done to others.

*Brief of Certain Defendants* at 3–4. In *Bangor Punta* terms, since Electrolux is the sole owner of NUE shares, it is the real party in interest in the NUE action and would be the exclusive beneficiary of any damages NUE might recover. Since Electrolux "got what it paid for" in acquiring NUE, paid nothing as such to acquire the lawsuit, and has itself suffered no injury, defendants contend that recovery by NUE would unjustly enrich Electrolux in violation of the principles of equity relied upon in *Bangor Punta*. Thus we refer to the matter before us as the "*Bangor Punta*" motion.

Plaintiffs, on the other hand, conceive of *Bangor Punta* as a doctrine limited to cases in which a plaintiff seeks to recover damages from the prior owners of corporate stock (from whom the plaintiff acquired the stock) for wrongs in the nature of mismanagement or waste of corporate assets perpetrated upon the acquired corporation prior to acquisition. In such a circumstance the prior owners, as sole owners of the harmed corporation, have, in effect, committed harm upon themselves, and, since the acquiring company, in the absence of fraud in the sale, "got what it paid for" (paying a value for the stock of the distressed corporation that reflected the mismanagement) to permit it to recover damages from the former owner would constitute a recoupment of the purchase price. Accordingly, plaintiffs submit that the *Bangor Punta* doctrine is inapplicable where, as here, the defendants are not former owners but strangers to the subject corporation. Because the facts of *Bangor Punta* are very different from those before us, plaintiffs distinguish *Bangor Punta* and urge us not to apply it or its principles to this case.

Obviously we must commence the substantive portion of this opinion with an exegesis of *Bangor Punta* so as to determine its scope and its applicability at bar. The latter inquiry will turn not just on the language of *Bangor Punta*, but also upon more general principles of the law of equity and of property as well as antitrust law policy considerations.

For reasons that will in due course appear, we find that *Bangor Punta* may not be read expansively and that it should not be applied here. While that conclusion would be enough to dispose of the motion, we prefer, in view of the nature and magnitude of this case, and our proximity to trial, to leave no aspect of the motion undecided. We shall therefore reach the second aspect of this motion: assuming arguendo that *Bangor Punta* does apply to the case, is there a genuine issue of material fact as to whether the present lawsuit was a factor in the Electrolux acquisition (or whether Electrolux paid any consideration for the lawsuit).

This inquiry in turn implicates certain appraisal proceedings in Delaware Chancery Court that have occurred in the wake of the freeze–out merger, as well as a lawsuit filed in the United States District Court for the Western District of Texas by disgruntled former NUE shareholders who object to the price per share paid in the merger. In particular, defendants point to certain findings of the court–appointed appraiser in the Delaware proceeding and NUE's endorsement of those findings, especially the appraiser's conclusion that the lawsuit had no asset value.[5] According to defendants, these facets of the Delaware proceeding not only make clear that no consideration was paid for the lawsuit, but also call into play the doctrines of collateral estoppel and judicial estoppel, barring NUE from contending that consideration was paid. For reasons that will also appear, we find it plain that there is a genuine issue of

---

5. NUE sought successfully to uphold the appraiser's conclusion that the $28 per share paid the stockholders in the freeze–out merger was fair.

material fact as to Electrolux's payment of consideration to acquire the lawsuit, and that the estoppel arguments do not change that result.

## II. *Bangor Punta*

### A. *Bangor Punta Explained–Its Facts and Its Reasoning*

In 1964, the Bangor Punta Corporation purchased, through its subsidiary, Bangor Punta Operations, 98.3% of the stock of plaintiff Bangor & Aroostook Railroad (BAR). In 1969, Bangor Punta sold all of its stock to Amoskeag Company, which later obtained additional shares so that it ultimately held in excess of 99% of the BAR stock. In 1971, BAR filed suit against Bangor Punta alleging violations of § 10 of the Clayton Act, 15 U.S.C. § 20, various sections of the federal securities laws, and Maine statutory and common law, and seeking seven million dollars in damages for mismanagement, misappropriation, and waste of BAR's assets during the period Bangor Punta controlled BAR. The district court (Gignoux, J.) granted summary judgment for the defendants and dismissed the complaint, *Bangor & Aroostook Railroad Co. v. Bangor Punta Operations, Inc.*, 353 F.Supp. 724 (D.Me.1972), reasoning that, although the suit purported to be a primary action brought in the name of the corporation, the real party in interest in the suit, and the actual beneficiary of any recovery, was Amoskeag, which had suffered no injury because it owned no stock at the time the alleged wrongful acts occurred and got full value for its purchase price. Any recovery under these circumstances would constitute a "windfall" for Amoskeag "contrary to established equitable principles." *Id.* at 727. The court noted that Amoskeag would have been barred from bringing a derivative suit because of the requirement of Fed. R.Civ.P. 23.1 that a plaintiff in a derivative action must have been a shareholder at the time of the act of which he complains (the contemporaneous ownership requirement, see *infra*) and thus viewed the BAR suit as an attempt by Amoskeag to accomplish indirectly, by bringing suit in the corporate name, what it could not do directly.

The Court of Appeals for the First Circuit reversed, finding that the equitable principles relied upon by the lower court were outweighed by the public interest in the financial stability of railroads. The court disagreed with the district court's conclusion that Amoskeag would be the sole beneficiary of any recovery by BAR, noting that recovery would also inure to the benefit of the public. This fact was viewed as sufficient to support the corporate cause of action and rendered irrelevant any windfall to Amoskeag. In addition, the court noted that recovery would provide a deterrent to future acts of mismanagement.

The Supreme Court reversed the court of appeals, adopting much (but not all, see *infra*) of the reasoning of the district court and concluding that in view of the absence of fraud in the sale of stock of Amoskeag, Amoskeag had not been injured and thus had no standing in equity to pursue the action. The Court determined that the case was an appropriate one in which to ignore the distinction between the corporation, in whose name suit was brought, and its principal shareholder, Amoskeag. Since Amoskeag was "itself estopped from complaining of petitioner's alleged wrongs," it could not avoid the command of equity "through the guise of proceeding in the name of the respondent corporations which it owns and controls." 417 U.S. at 713, 94 S.Ct. at 2584. "[W]here equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." *Id.*

In determining that Amoskeag, as principal shareholder of BAR, would be precluded from maintaining the action in its own right, the Court relied primarily on Dean (then Commissioner) Roscoe Pound's decision in *Home Fire Insurance Co. v. Barker*, 67 Neb. 644, 93 N.W. 1024 (1903), which held that where all the shareholders of a corporation had purchased their stock from a wrongdoer at a price that reflected the acts of mismanagement later sought to be complained of, the corporation had no standing in equity to sue the former owners: " 'whatever will estop the stockholders

will estop the corporation ....'" 67 Neb. 644, 93 N.W. at 1033. The *Home Fire* decision rested on three interrelated and largely overlapping equitable principles: (1) the "tainted shares" doctrine, which precludes a shareholder from complaining of acts of corporate mismanagement if his transferor participated or acquiesced in the wrongdoing; (2) the contemporaneous ownership rule, which requires that the plaintiff have been a shareholder at the time of the alleged wrongful acts (any person who would be prevented from maintaining an action by virtue of the tainted shares doctrine would also be precluded under the contemporaneous ownership rule, though the converse would not be true in all cases); and (3) the inequity of permitting shareholders who had acquired a large part of their interest through the very acts of management complained of and who had paid a fair market value to recover back their purchase price, *i. e.*, to prevent the new shareholders from reaping a windfall by in effect obtaining a corporation for nothing.

Because the applicability of these principles to the Electrolux purchase of NUE and their effect on the viability of this lawsuit are at issue here, we set them forth in some detail.

*The Tainted Shares Rule*

The tainted shares rule precludes a purchaser of stock from complaining of acts of corporate mismanagement if he acquired his shares from a vendor who participated or acquiesced in the wrongdoing. The rationale for the rule is that, because shares are not negotiable paper, a seller cannot transfer any better litigious rights than he himself possesses. If the seller is estopped from maintaining a suit, so too is his buyer.

*The Contemporaneous Ownership Rule*

The contemporaneous ownership requirement for shareholder derivative actions was first announced in *Hawes v. Oakland*, 104 U.S. 450, 26 L.Ed.2d 827 (1882), and later was adopted as Equity Rule 97. At present it is codified in Fed.R.Civ.P. 23.1(1) which provides that the complaint shall allege "that the plaintiff was a shareholder at the time of the transaction of which he com-

plains or that his share ... devolved on him by operation of law." The original purpose of the contemporaneous ownership requirement was to prevent transfers of shares to a nonresident in order to confer federal diversity jurisdiction. More recently the rule has been deemed designed to prevent champertous or speculative litigation, particularly as manifested in strike suits. *See generally* 7A Wright and Miller, *Federal Practice and Procedure* § 1826 and 3B *Moores Federal Practice* ¶ 23.1.15. In *Home Fire*, Dean Pound gave the contemporaneous ownership rule life independent of its federal roots, positing that, "so long as [the new shareholder] is not injured in what he got when he purchased, and holds exactly what he got and in the condition in which he got it, there is no ground of complaint." 67 Neb. 644, 93 N.W. at 1029. The focus of Dean Pound's discussion of the contemporaneous ownership rule is on the lack of injury to the new shareholder, who paid fair market value for his stock. Since the breach of fiduciary duty was to his vendor, the new shareholder has no cause to complain. Underlying Dean Pound's discussion of the contemporaneous ownership rule is the assumption that the vendor has chosen not to complain of the acts of mismanagement. "The right to complain of [corporate mismanagement] is one which the stockholders injured may or may not exercise as they choose. Where such transactions are not absolutely void, they may, if they so elect, acquiesce and treat them as binding. The discretion whether to sue to set them aside or to acquiesce in and agree to them is incapable of transfer ... [The new shareholder] can take no advantage of the power which was in his vendor and the latter did not care to exercise." *Id.* at 1030.

Thus it is clear that while Dean Pound was concerned about the lack of injury to the present shareholders, this concern was accompanied by the assumption that the former shareholders had not complained about the injury inflicted upon them, presumably acquiescing in it to the extent that they accepted a price that reflected the acts of mismanagement. The injustice of the

enrichment lay in the new shareholders asserting a cause of action that had never been asserted by the old shareholders.[6]

*Unjust Enrichment*

The third equitable principle relied upon in *Home Fire* essentially consists of further ruminations on the subject of unjust enrichment. As discussed in *Home Fire*, that principle is related to the notion of speculation that underlies the contemporaneous ownership rule. "[To permit the new shareholders to recover] would be to give them moneys to which they have no just title or claim whatever, and enable them to speculate upon wrongs done to others with which they have no concern. It would enable them to recover back a large part of the purchase money they paid and agreed to pay for the stock, notwithstanding the stock was worth all that they paid for it, and notwithstanding they obtained and now retain all that they bargained for." *Id.* at 1031. The emphasis throughout Dean Pound's discussion in this section of *Home Fire* is on the inequity of permitting the present shareholders to recoup their purchase price and recover from the defendant moneys that in equity belonged to him, as major shareholder, when he wrongfully appropriated them, *i. e.*, to permit recovery for wrongs the defendant had done not to plaintiffs but to himself.

The factual postures of *Home Fire* and of *Bangor Punta* are remarkably similar.[7] Both involved attempts by new shareholders to recover damages from the former owners in the name of the corporations they now controlled, in effect to rescind contracts knowingly and voluntarily entered into while nevertheless retaining the bene-

fits of their bargains. Justice Powell found the considerations supporting what he termed "the *Home Fire* principle" to be "especially pertinent" in *Bangor Punta* since Amoskeag, the principal beneficiary of any recovery, had acquired its shares long after the wrongs occurred and did not assert that it had sustained any injury at all on account of defendant's acts of mismanagement.

Rejecting the notion relied on by the court of appeals that any recovery would inure to the benefit of the public through the improvement of the corporation's economic position and the quality of its services, the *Bangor Punta* Court determined that the assumption that any recovery would necessarily benefit the public was unwarranted, since BAR could divert recovery to its shareholders rather than reinvest it in the railroad. Throughout *Bangor Punta*, the Court emphasizes the fact that recovery in these circumstances would constitute a "windfall." As for the deterrent value of such suits and the effective immunity from punishment that the wrongdoers would enjoy, Justice Powell commented somewhat ascerbically that "if deterrence were the only objective, then in logic any plaintiff willing to file a complaint would suffice." 417 U.S. at 717, 94 S.Ct. at 2586. Refusing to "indiscriminately extend causes of action to every citizen," he concluded that the action could not be maintained.

The four dissenters quarrelled with the majority's reading of the precedents relied upon—particularly *Home Fire*—positing that the *Home Fire* principles were applicable only where *none* of the corporation's shareholders held stock at the time of the alleged

---

**6.** Dean Pound's discussion also presumes that the cause of action was not in the contemplation of the parties at the time the shares were transferred. *Id.* at 1030. This assumption, while a valid one in both *Home Fire* and *Bangor Punta*, is simply not applicable here. *See* discussion *infra* at 1004–1005.

**7.** It should be noted, however, that at least part of the impetus for the holding in *Home Fire* was that the present shareholders acquired a large portion (but not all) of their stock by

virtue of the very acts of mismanagement they sought to attack, *i. e.*, their vendor had wrongfully used funds of the company to buy the shares he later sold to plaintiffs at fair market value. There is no evidence that Bangor Punta similarly misappropriated corporate funds to purchase the shares it later sold to Amoskeag, so the facts of *Bangor Punta* are somewhat less compelling, and in that sense the opinion can be read as enunciating a doctrine more broadly applicable than that announced in *Home Fire*.

wrongdoing.[8] Where, as in *Bangor Punta*, there were minority shareholders who held stock at the time the wrongs occurred, recovery by the corporation either in its own name or through a derivative action brought by the minority shareholders would, in their view, be perfectly appropriate even if the wrongdoers continued to hold stock and would thereby benefit from the recovery. The dissenters further argued that even if *Home Fire* could be read to preclude recovery where there were minority shareholders, the equitable principle it announced should not be permitted to bar recovery given the public's interest in the vitality of its railroads, the interests of BAR's creditors, and the important policies expressed in the antitrust laws, policies whose furtherance is dependent in large measure on private damage actions. The dissent thus viewed the result as inconsist-ent with prior opinions of the Court that limited the application of equitable defenses where they would impede the vindication of those policies through the vehicle of private treble damage litigation.

## B. *Bangor Punta Construed—Its Scope and Applicability*

The critical question here is whether the equitable principles relied upon in *Home Fire* and *Bangor Punta* have application beyond the peculiar factual pattern that characterized both those cases—and indeed all of *Bangor Punta's* reported progeny, for this is the first case in which *Bangor Punta* has been invoked by defendants who are not either former owners of the corporation in whose name recovery is sought or someone acting in concert with those former owners.[9]

**8.** Less than one percent of BAR's stock was held by persons other than Amoskeag. To the extent that the dissenters' view is premised on the existence of those minority shareholders, who owned stock at the time of the alleged wrongdoing, it does not support the position plaintiff here espouses, since this lawsuit, like *Home Fire*, is brought by a corporation whose ownership has completely changed hands since the time of the acts at issue.

**9.** Notable among the post *Bangor Punta* cases are *In re REA Express, Inc.*, 412 F.Supp. 1239 (E.D.Pa.1976); *REA Express, Inc. v. Travelers Insurance Co.*, 406 F.Supp. 1389 (D.D.C.1976), *aff'd in part and modified in part*, 554 F.2d 1200 (D.C. Cir.), *cert. denied*, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977); and *Rock River Savings & Loan Ass'n v. American States Insurance Co.*, 594 F.2d 633 (7th Cir. 1979), all of which included among the defendants third parties who were not former shareholders. Though by virtue of this fact, they provide some support for the defendants' position here, because the factual patterns on which they are based are so closely allied with that of *Bangor Punta*, they provide little guidance for such a case as is before us.

In *In re REA Express, Inc., supra*, the principal defendants were a number of railroads who were also former owners of almost all the REA stock and who had allegedly conspired in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, to (1) avoid competition among themselves and other railroads by setting rates to be charged REA for rail transportation and by dictating contract terms that were disadvantageous to it; (2) impose onerous charges and conditions on REA's use of defend-ants' properties and facilities; and (3) prevent REA from engaging in activities competitive with those engaged in by defendants. Those defendants who were not former owners had but a miniscule role in the litigation; they were signatories of the uniform contracts that formed the basis of the antitrust violations alleged. In granting summary judgment for defendants on *Bangor Punta* grounds, we characterized the action as one involving a "parent-subsidiary relationship where the 'damage' suffered by the subsidiary is essentially only a matter of internal accounting," 412 F.Supp. at 1254, and we noted that, like the defendants in *Bangor Punta*, the defendants in *REA* had inflicted damage only upon themselves. *Id.* at 1252. The question whether the non–owner defendants could have been treated differently than the owner defendants did not arise and was not discussed.

*REA Express, Inc. v. Travelers Insurance Co., supra*, was another case brought by REA against its former owners and others, including Traveler's Insurance Co. Traveler's role as a defendant in the suit was premised on the fact that it wrote health and life insurance policies that covered both railroad and REA employees. REA's required participation at the same rate as was paid by the railroads was alleged to constitute illegal price–fixing, waste, and mismanagement. The court described the factual posture of the case as "almost identical" to that in *Bangor Punta*, 406 F.Supp. at 1392, and summarized its holding as follows: "In short, REA has not shown any injury which accrued to anyone but the railroad defendants. To allow REA, the holding corporation, or REA's creditors, to recover for wrongs inflicted by the defendants on themselves, would clearly be un-

We have reflected at length in an attempt to extract the essence of *Bangor Punta*. Our conclusion is that *Bangor Punta* stands mainly for the proposition that in analyzing the standing of an antitrust plaintiff the court may disregard the corporate fiction when equitable considerations so require, *i. e.*, when the corporate form "is used to defeat an overriding public policy." 417 U.S. at 713, 94 S.Ct. at 2584. The question we must therefore grapple with is whether the equities in this case require us to disregard NUE's corporate identity and look to the identity of its current shareholder, Electrolux, which will in some measure be enriched by any recovery that might be had in the corporate name.[10] *Bangor Punta* instructs us that "where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." *Id.* We must

thus determine whether *equity* would prohibit this action by NUE's shareholders.

At the outset we note that there is no allegation–and, indeed, there could be none–that when this lawsuit was originally filed in 1970, it was not properly maintainable by NUE itself, for the cause of action was a corporate cause of action; the injuries said to have occurred at the hands of the defendants were injuries to the business and property of NUE, and NUE was the statutorily designated plaintiff. Presumably, had NUE failed or refused upon proper demand to bring the action, one or more of its shareholders could have instituted a derivative suit complaining of the injury suffered by the corporation because of defendants' anticompetitive acts.[11] Since the lawsuit was never styled as a derivative action, however, we must ascertain whether the transfer of shares to a new owner brings

---

just enrichment . . . ." *Id.* at 1396. Once again, the unjust enrichment conclusion is couched in terms of self–inflicted injury; the non–owner defendants, against whom the action was also dismissed, acted in concert with the owner defendants as they inflicted damage upon themselves. Because the court supplies no separate analysis in discussing the non–owner defendants (the entire discussion is relegated to a one–sentence footnote, *id.* n.6), it is impossible to draw any broad rule of law from the dismissal of the action as to them.

While perhaps the strongest authority for defendants' position can be found in *Rock River Savings & Loan Ass'n v. American States Insurance Co., supra*, a close reading of that case reveals that it too provides little in the way of precedent for the case at bar. In *Rock River* the plaintiff savings and loan association alleged that it had suffered a loss due to the fraudulent conduct of five of its former officers and that this loss was compensable under a surety bond issued by the defendant, American States Insurance Co. American States joined as third-party defendants the five former officers and the association's accountants; the latter's liability was premised on their alleged failure to discover the fraudulent transactions. Following settlement of the primary action, the district court dismissed the third party action, reasoning that since after the fraud was made public the entire stock of the association had been sold, any recovery by the association from the former owners or the accountants would be of the sort held impermissible in *Bangor Punta*. Since the subrogee has no greater rights than the subrogor, American States had no standing to maintain the action. The court of appeals affirmed. It rejected American States' conten-

tion that *Bangor Punta* did not apply because it was seeking recovery from a third party who was neither guilty of wrongdoing nor acquiesced in it. The court determined that *Bangor Punta* need not be confined to actions against former owners but rather that its equitable considerations come into play if (1) plaintiff is a shareholder who acquired its shares from a wrongdoer and (2) the claim for relief seeks damages for those same acts of mismanagement. "It is the combination of these two factors that 'would permit [the new shareholder] to reap a profit for wrongs done to others.' Viewed from this perspective, then, it is clearly a matter of no consequence that the appellant is seeking to recover such a 'windfall' from the accountants. . . ." 594 F.2d at 635. Thus, the thrust of the holding is once again the tainted shares/self inflicted injury analysis we have seen in the REA cases and in *Bangor Punta* itself, and the incidental presence of a party acting in concert makes no difference in the result. The focus is on the nature of the plaintiff, who has acquired his shares *from the wrongdoer* at a fair price.

**10.** Of course, Electrolux has incurred obligations here too, since its wholly owned subsidiary, NUE, continues to finance the lawsuit.

**11.** Prior to the adoption of the Federal Rules of Civil Procedure, which abolished the procedural distinctions between law and equity (Rule 2), a suit for treble damages, which was deemed an action at law, could not have been brought by a shareholder, since a derivative suit is an equitable device.

into play the equitable difficulties identified in *Bangor Punta* and thus extinguishes what was a properly framed and instituted lawsuit.

It is useful for purposes of analysis to assume for the moment that the present action was instituted by NUE *following* rather than *prior* to the tender offer by which Electrolux came to control the corporation. Under these circumstances, would the equitable principles relied upon in *Bangor Punta* preclude the new shareholders from maintaining the action and thus also preclude NUE from pursuing it? We approach the problem by considering the applicability of the three conceptual underpinnings of the *Home Fire/Bangor Punta* doctrine.

First, it is clear that the "tainted shares" doctrine is inapposite here since unlike the shareholders in *Home Fire, Bangor Punta*, and the REA cases, Electrolux did not acquire its holdings from wongdoers or those who acquiesced in wrongdoing. More difficult questions are whether the contemporaneous ownership requirement and/or the "windfall" analysis advanced in *Home Fire* would preclude such a lawsuit.

The contemporaneous ownership requirement is now embodied in Fed.R.Civ.P. 23.-1(1). As a matter of procedure, had Electrolux attempted to institute the present suit as a derivative action complaining of wrongs that occurred prior to its acquisition, it would have been prevented from doing so by Rule 23.1. Indeed, a derivative action properly brought by NUE's previous shareholders would have abated upon the transfer of the shares. 3B *Moore's Federal Practice* ¶ 23.1.17; 7A *Wright & Miller, Modern Federal Practice and Procedure* § 1826. But, this said, it does not follow that this procedural requirement can be used to pierce the corporate veil when the action is instituted by the corporation, *i. e.,* unless the rule has a substantive equitable basis, it cannot be the ground upon which corporate standing can be denied.

It has been suggested by Professor Moore and Professors Wright and Miller in their treatises that Rule 23.1(1) should not be read to bar a direct suit by the corporation itself when none of its present shareholders held stock during the time of the alleged injury and are therefore themselves ineligible to sue derivatively. "Inasmuch as the language of Rule 23.1(1) applies only to derivative actions, extending its application to prevent an action by the corporation is not justified either textually or as a matter of policy underlying the provision." 7A Wright and Miller, *supra* § 1828 at 353. This position is adopted in *Aeronca, Inc. v. Style–Crafters, Inc.,* 499 F.2d 1367, 1374 (4th Cir. 1974), where Rule 23.1 was held inapplicable to a credit transaction between two corporations, one of whose ownership had changed following the acts that formed the basis of its defense and counterclaim. The court declined to apply a "strained construction of rules designed to govern suits between stockholders and corporate officers or directors, or stockholders and the corporation in which they may hold stock." *See also Central Railroad Signal Co. v. Longden,* 194 F.2d 310, 321 (7th Cir. 1952) (construing the predecessor provision to Rule 23.1). "We think the doctrine of contemporaneous ownership . . . does not apply to a suit by a corporation . . . It is clear that the rule has to do with a secondary action by shareholders and not with primary actions by incorporated or unincorporated associations; it has no application where the corporation brings the action itself to enforce its own right, as here."

It is important to note that the district court in *Bangor Punta* did conclude that since Amoskeag would be barred from maintaining a derivative action by Rule 23.-1(1), so too would BAR. The Supreme Court, while describing this analysis in its statement of the case, did not rely upon it, specifically noting that the issue whether the requirement is one of procedure only or one of substantive law has never been resolved.[12] 417 U.S. at 708, n. 4, 94 S.Ct. at

---

12. The question whether the contemporaneous ownership requirement is one of procedure or

of substantive law has generally arisen in the context of diversity cases. If the rule is one of

2582 n. 4. Professor Moore states that the "better" view of *Bangor Punta* is that it is based on equitable estoppel and that Rule 23.1(1) is simply not applicable to a suit by the corporation itself. The evils that the contemporaneous shareholder rule is designed to prevent—manufactured jurisdiction and strike suits by minority shareholders—are not present when the corporation sues, and thus the rationale for the rule would not be furthered should we apply it in this case, and we decline to do so, recognizing its relevance only insofar as it incorporates, as Dean Pound appears to suggest in *Home Fire*, 67 Neb. 644, 93 N.W. at 1031, notions of "windfall" or unjust enrichment,[13] to a discussion of which we now turn.

Initially, we must note some conceptual difficulties that stem from the rather broad language employed by the Court in *Bangor Punta*, particularly its unfortunate use of and emphasis upon the notion of "windfall," a lay term that apparently is meant to be synonymous with "unjust enrichment." "Windfall" is defined by Webster as "an unexpected or sudden gain or advantage." That definition is plainly too general to be useful as a legal precept, particularly since it does not express the pejorative connotations apparently placed upon it in *Bangor Punta*. And the notion of unjust enrich-

ment would seem at least as supportive of plaintiff's position as of defendants', since were we to dismiss this suit on *Bangor Punta* grounds, defendants would be able to keep the profits they made at NUE's expense.

Defendants view *Bangor Punta* as stating that a court must never permit a "windfall" to occur (for under their model a "windfall" will always amount to unjust enrichment), and that a "windfall" will occur whenever a buyer purchases shares of a damaged corporation at a price reflecting the damage and then recovers, in the corporate name, on account of that damage. In defendants' view, the identity of the damager—be it former owner or third party—is irrelevant, as is the question whether the lawsuit preexisted the sale. NUE reads *Bangor Punta* more narrowly to state that the inequity of recovery there lay in the fact that defendant would have to pay twice for its wrongdoing, once when it sold its shares at a price reflecting its own mismanagement[14] and a second time in damages. In NUE's view *Bangor Punta* has no applicability when the defendant is a stranger to the corporation.

We think that although there is some comfort in *Bangor Punta* for each position, the thrust of the opinion is somewhat different from the characterization placed

procedure only, then it would bar a diversity action where the plaintiff did not own shares at the time of the alleged injury. If, however, the rule has a substantive basis, then under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it could not validly be applied to defeat an action where the forum state does not require contemporaneous ownership. In the context of the present case, it would appear that if the rule is merely one of procedure, it does not rise to the level of an equitable principle that would support disregard of the corporate veil, even though it would bar suit by the shareholders.

**13.** To the extent that the contemporaneous shareholder rule is aimed at preventing a broader kind of speculation in litigation than the strike suit, it might legitimately be used to pierce the corporate veil where a stranger to a corporation, aware of intracorporate mismanagement or fraud, wholly acquires the distressed company in the hope of extracting damages from the wrongdoers, be they the former

owners (as in *Bangor Punta*) or directors and officers or others who held no shares. In this sense, *Bangor Punta* need not be read narrowly and might similarly have application where a stranger to a corporation, aware of possible antitrust activity directed at that corporation, wholly acquires its shares at a price reflecting the antitrust damage and then seeks to institute an action in the name of the corporation to recover for that damage, thus speculating in a corporate cause of action that had lain dormant prior to the transfer of shares. We do not believe, however, that if the contemporaneous shareholder rule does indeed reflect a desire to prevent this sort of speculation, it should be extended to cases such as the one before us, where the litigation was ongoing at the time of sale. *See infra* at 1003-1005.

**14.** In both *Bangor Punta* and *Home Fire*, the defendants disgorged the gain they made at the expense of the corporation when they sold their shares at a distressed price.

upon it by either party here. While we agree with defendants that in *Bangor Punta* the focus of the Court is on the inequity of the plaintiff's recovery, rather than on the defendants' conduct or loss ("'A plaintiff must recover on the strength of his own case, not on the weakness of the defendant's case. It is his right, not the defendant's wrong–doing, that is the basis of recovery,'" 417 U.S. at 717 n. 14, 94 S.Ct. at 2586 n. 14, quoting *Home Fire*, 67 Neb. at 673, 93 N.W. at 1035), we do not agree that it therefore follows that the principles espoused in *Bangor Punta* are readily transferable beyond the factual circumstances in which they were employed and that recovery must be denied whenever a corporation seeks to recover for injury suffered before new owners acquired its shares.

First, we are struck with the apparent care taken by Mr. Justice Powell, speaking for the Court, to relate the *ratio decidendi* to the facts of the case, framing the issue as whether recovery can be had in "these circumstances." 417 U.S. at 705, 94 S.Ct. at 2580.

> The resolution of this issue depends upon the applicability of the settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the alleged wrongful transactions.

> . . . . .

> This principle has been invoked with special force where a shareholder purchases all or substantially all the shares of a corporation from a vendor at a fair price, and then seeks to recover against that vendor for prior corporate mismanagement.

417 U.S. at 711, 94 S.Ct. at 2583.

> . . . . .

> The equitable considerations precluding recovery in such cases were explicated long ago [in *Home Fire*, where Dean Pound] observed that the shareholders of the plaintiff corporation in that case had sustained no injury since they had acquired their shares from the alleged wrongdoers after the disputed transac-

tions occurred and had received full value for their purchase price.

*Id.*

. . . . .

In other words, Amoskeag seeks to recover for wrongs Bangor Punta did to *itself* as owner of the railroad. At the same time it reaps this windfall, Amoskeag desires to retain all its BAR stock.

*Id.* at 712, 94 S.Ct. at 2584 (emphasis in original).

Moreover, in discussing the court of appeals' failure to consider Amoskeag's unjust enrichment, Justice Powell observed:

> The equitable principles of *Home Fire* preclude Amoskeag from reaping a windfall *by enhancing the value of its bargain* to the extent of the entire purchase price plus an additional $2,000,000. Amoskeag would in effect have acquired a railroad worth $12,000,000 for only $5,000,000. Neither the federal antitrust or securities laws nor the applicable state laws contemplate recovery *in these circumstances*.

*Id.* at 716, 94 S.Ct. at 2585–86 (emphasis added).

Thus, the windfall in the Court's own terms arises when Amoskeag enhances the value of its bargain, *i. e.*, when it recovers *back* from the defendant the consideration that it admits fairly reflected the value of the shares. To this extent we think the holding of the Court is dependent on the identity of the defendant, not so much because it will have to pay twice (although that would be the practical effect of a ruling in plaintiff's favor) but because permitting plaintiff in effect to attack its bargain and recover back its consideration while keeping the benefits of that bargain is the sort of conduct that shocks the conscience of the court and requires disregard of the corporate fiction to prevent. It is indeed the weakness of plaintiff's position that informs the court's holding–the inequity of permitting it to acquire "something for nothing."

Here, in contrast, while recovery by NUE would derivatively benefit Electrolux as

sole shareholder, the recovery would not literally or figuratively be recovery of the consideration paid by Electrolux for the corporate shares, but rather would be in the form of damages for antitrust violations committed by third parties. We do not believe the increased value of Electrolux's holding falls within the "circumstances" abhorred by the Court in *Bangor Punta*, or that it would constitute a "windfall" in the pejorative sense that the Court employs the term, or that enrichment under these facts would be unjust.[15] Here, Electrolux does not seek to attack its bargain, nor does it use the corporate form "to defeat some overriding public policy."

We think it important in this regard that in *Bangor Punta* (and in *Home Fire*) there was no lawsuit, and there could not have been a lawsuit, until the transfer of shares took place. In this sense the former owners of BAR had nothing to sell except a corporation wasted by their acts of mismanagement. An action brought by BAR prior to the sale would have been an action against itself, for the injury suffered by BAR was coextensive with the injury suffered by the wrongdoers. In such circumstances it makes no sense to adhere to the corporate fiction, for as a practical matter the corporation has not suffered any cognizable inju-

ry. The inequity of permitting the new owners to pursue a cause of action that could not have existed but for the transfer of shares is apparent, for it would permit them to speculate on wrongs done to others by those others and thus wrongs for which there was no remedy. "For the corporation to sue [the sole shareholder who defrauds or mismanages his own corporation] is simply to take money out of his right pocket and put it in his left." 417 U.S. at 721, 94 S.Ct. at 2588 (dissenting opinion of Mr. Justice Marshall). Here, by way of contrast, (and we thus put aside our earlier hypothetical, posed *supra* at 1004, that the lawsuit was brought *after* the acquisition), the defendants urge us to disregard the corporate entity in order to *extinguish* a cause of action that both existed and was pursued before the transfer of shares. The corporate injury did not occur at the hands of its shareholders, but at the hands of third parties. The injury is a cognizable one at law for which a remedy exists. To say that that remedy abates because the corporation was sold would seem to us to result in the very inequity that the *Bangor Punta* court was attempting to avoid and would permit the "windfall" to devolve upon defendants.[16]

**15.** Defendants seem to be saying that there is something special about lawsuits that puts them into the "windfall" category and makes it inequitable for the purchasers of stock to retain the benefits thereof, even derivatively. We fail to see the distinction between a lawsuit and other assets, except to the extent that a lawsuit may not be valued with the precision of certain other corporate property. To illustrate our point, consider the following example: Suppose that among the corporate assets of BAR was a fifty cent lottery ticket purchased with corporate funds on the occasion of its president's birthday. Assume further that when Bangor Punta sold its interest in BAR to Amoskeag, Amoskeag paid no "extra" consideration for the lottery ticket, which remained, as it had for many months, in the Executive Vice-President's "In" box. When the lottery ticket is drawn as a million dollar winner, does the corporation get to keep the proceeds, even though its new shareholders are unexpectedly enriched by the new influx of capital into their corporation? Of course it does. Is this "windfall" somehow unjust? We think not. In sum, we believe there would be no windfall more or

less, than with a preexisting lawsuit. What all this illustrates is how useless and misleading it is to talk of "windfalls" in contrast to the kinds of equitable considerations which actually informed the *Home Fire*, *Bangor Punta*, and *REA* decisions.

**16.** Defendants have cited *Jannes v. Microwave Communications, Inc.*, 385 F.Supp. 759 (N.D.Ill. 1974), to support their contention that *Bangor Punta* prohibits this action even though it was commenced before the transfer of shares. We do not find *Jannes* helpful on this point because of the peculiarity of its facts. In *Jannes*, which was a derivative action on behalf of a corporation, MCI, suit was instituted against another corporation, MI-COM and certain former directors of MCI for violation of the securities laws and acts of waste and mismanagement. While the lawsuit was pending, MI-COM, the principal defendant, became the major shareholder of MCI; thus any recovery would principally benefit the defendant. As the court observed, "the interests of equity would certainly demand that the wrongdoer should not profit from his own wrong." *Id.* at 760. Thus MI--

At oral argument we suggested to counsel that if we were to grant this motion and, yet also avoid a windfall to defendants by permitting them to escape liability for their putative anticompetitive acts, we would have to substitute the Feldmann Estate and the other former shareholders of NUE for the corporate plaintiff. While this substitution would be forbidden by the terms of the tender offer and merger, the suggestion is useful for analytic purposes, by way of comparing the NUE case to the *Bangor Punta* and *REA* models. What is striking about the comparison is that, unlike *Bangor Punta* or *REA*, where the former owners would be suing themselves, permitting the former NUE shareholders to sue the defendants would make eminent sense in that it would allow them to recoup what they lost by selling an asset (the NUE stock) at a price distressed not by their own depredations, but by those of defendants.

At this juncture it is useful to note Dean Pound's observation in *Home Fire* that "it may be doubtful whether a purchaser of stock buys or intends to buy anything beyond the vendor's present interest in the corporation and its assets. His vendor's causes of action for past injuries and rights to complain of past mismanagement are scarcely in contemplation of the parties." 67 Neb. at 644, 93 N.W. at 1030. In *Home Fire* and in *Bangor Punta* the "causes of action for past injuries" did not exist, for, as we have seen, the shareholders could not have sued themselves, and thus those actions were clearly not bargained for or thought to pass to the new shareholders. Here, however, the lawsuit was ongoing and could scarcely have been ignored by vendor and vendee. Indeed, the terms of both the tender offer and the freeze out merger make clear that whatever benefit the former shareholders might have enjoyed upon a favorable conclusion of the litigation would pass to the new owners upon acquisition of the shares.[17]

While defendants may be correct in stating that an ongoing lawsuit is not classically termed an asset for accounting purposes, it is surely an aspect of the corporate existence that passes along with control of the corporation (unless otherwise provided), and whether or not Electrolux paid an identifiable and severable consideration for this part of the corporate entity, it is clear that the parties contemplated that the lawsuit would accompany the corporation when it changed hands, *i. e.*, that the *corporation* would continue to pursue its corporate cause of action. To repeat, under these circumstances, we see no equitable considerations in the nature of an overriding public policy that would cause us to ignore the corporate entity.

This construction is consistent with conventional notions of the law of corporations. In the ordinary course, when a buyer acquires the stock of a corporation, he does not think of his identity as shareholder as indistinct from the corporate identity or of the corporate assets as having become his own—he does not think in terms of a pierced corporate veil. Rather, the buyer assumes that the interest he acquires is an interest in a corporation with its own property and assets. He also assumes that the assets of the corporation will be unaffected by the transfer of shares, *i. e.*, that the fact of his acquisition will have no ramifications on the corporate entity and that the corporation's real property and its choses in action, including its lawsuits, will remain with the corporation.

COM and MCI were prohibited from sharing in any recovery, though the action was permitted to proceed for the benefit of the minority shareholders. We find little guidance in *Jannes* for the present situation, where the action was brought by the corporation and its new shareholder is not a wrongdoer.

17. The Tender Offer provides that "shareholders who tender their shares will, of course, not receive directly or indirectly any portion of any such recovery" in the NUE lawsuit. The Notice of Merger provides that "if National Union is successful in this litigation it could recover substantial monetary damages .... as recited elsewhere herein minority shareholders receive $28 per share in payment of their shares in the merger, subject to appraisal rights as discussed herein, and there is no provision in the merger for receipt by them directly or indirectly of any portion of any such recovery."

Defendants concede that so long as Electrolux paid any consideration whatsoever for this lawsuit, NUE is entitled to pursue it. Their accompanying argument that NUE should be permitted to recover no more than the amount of any consideration Electrolux paid for the lawsuit is in such irreconcilable conflict with the principle that the law will not question the adequacy of consideration that it undermines the credibility of their position. In the absence of the kind of overriding equitable principles that were present in *Home Fire*, *Bangor Punta*, or the REA litigation, using the veil–piercing device as a means to bar a newly acquired corporation from pursuing a preexisting lawsuit or to minimize its possible recovery would turn the law on its head.

The foregoing considerations are more than sufficient to support our conclusion that *Bangor Punta* announces a narrow doctrine that is inapplicable at bar. We find further support for that conclusion, however, in the *Bangor Punta* court's rather matter of fact rejection of the position of the four dissenting justices (and of the court of appeals) that Amoskeag should be deemed to have standing so as to further the deterrent purposes of the antitrust laws, for we doubt that the Court would so directly have rejected the deterrence argument had it deemed its holding to be of sweeping import or to extend beyond the factual pattern of the case. We say this because of a ninety year history of Supreme Court adherence to antitrust principles "aimed at preserving free and unfettered competition as the rule of trade," *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958), the enforcement of which depends heavily on the private treble damage action as "an ever–present threat to deter anyone contemplating business behavior in viola-

tion of the antitrust laws." *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 892 (1968).[18] We cannot conceive of the Supreme Court repealing or retrenching from those principles even to a modest degree without announcing that it was doing so, and there was no such announcement accompanying *Bangor Punta*.[19]

The continued vitality of the deterrence principle, *see, e. g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745, *reh. denied* 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977), militates against defendants' position. In our view in the absence of such facts as characterized *Bangor Punta*, which would render recovery inequitable, the deterrent policies of the antitrust laws must be deemed operative in order to encourage private litigants to enforce those laws. Under the circumstances of this case those deterrent policies form a far more powerful and overriding public policy than amorphous notions of windfall. Thus, respect for the corporate entity rather than disregard of it is the appropriate course.

## C. *Conclusion*

 We have analyzed the facts of the present case in terms of the three conceptual underpinnings of the *Home Fire/Bangor Punta* doctrine–tainted shares, contemporaneous ownership, and unjust enrichment–and have found that none will support application of *Bangor Punta* to this case. In terms of what is here the dominant question, that of unjust enrichment, while it may be true that Electrolux paid a price that reflected the fair market value of NUE following its antitrust injury and one that did not include "extra" or severable consideration for the lawsuit, we do not believe that any recovery by NUE and thus derivatively by Electrolux would amount to

18. In *Perma Life* itself the Court refused to permit an equitable defense, in that case *in pari delicto*, to bar a treble damage action.

19. It has been suggested that the majority's rejection of the deterrence argument may be interpreted as a refusal to extend the deterrence rationale of private actions to cases in which the only injury is a fictional one to the

corporate entity. Since the wrongdoer had disgorged its unlawful gain upon sale of its shares, insulating it from a lawsuit would neither encourage nor countenance similar acts of mismanagement. The deterrence is provided by the sale itself. *The Supreme Court, 1974 Term*, 88 Harv.L.Rev. 41, 234 (1974).

a "windfall" of the sort envisioned in *Bangor Punta*. *Bangor Punta* is totally inapposite on its facts and is a narrow case primarily applicable in situations where a new shareholder, proceeding in the corporate name, seeks to recover from its vendor for wrongs committed prior to the sale and reflected in the purchase price, and perhaps applicable where the new shareholder is found to have engaged in speculation in other kinds of corporate causes of action. *See* n. 13, *supra*. We do not believe, however, that *Bangor Punta* can be read to extend to a case where the shares of a corporation that has been actively pursuing a lawsuit are wholly acquired by new owners. While *Bangor Punta* will not permit a lawsuit to be created solely by virtue of a transfer of shares, it does not require a properly instituted action to abate upon such a sale.

*Bangor Punta* holds that the court must ignore the corporate fiction when the equities of the case so require. For the reasons we have described, we find that the equities here do not justify such action. To the contrary, they weigh in favor of plaintiff corporation, which has alleged that it suffered an injury for which the antitrust laws provide a remedy. To read *Bangor Punta* so broadly as to extinguish that remedy and thus insulate the wrongdoers would be both to disregard the deterrent purposes of the antitrust laws and to turn on their head equitable rules, which are by nature flexible and designed to be applied only to prevent an injustice the law would otherwise permit. We do not believe our holding confers standing on "any plaintiff willing to file a complaint," 417 U.S. at 717, 94 S.Ct. at 2586, but rather that it merely states the proposition that where an action is properly brought by a corporation, a change in that corporation's ownership will not in and of itself suffice to cause the action to abate.

Although we are confident that the Supreme Court announced no broad rule of law in *Bangor Punta* that would prohibit NUE from continuing to pursue this lawsuit, in view of the magnitude of the case and the legal resources brought to bear in each of the many motions that has been filed, we think it is important to dispose of all the issues implicated here. We therefore consider in the section of this opinion that follows whether, assuming that *Bangor Punta* does apply in these circumstances, there is nevertheless a genuine issue of material fact as to whether Electrolux paid value for the lawsuit, which would render a grant summary judgment inappropriate.

### III. *Assuming Arguendo the Applicability of Bangor Punta, Are There Genuine Issues of Material Fact That Would Prevent the Grant of Summary Judgment*

### A. *The Contentions of the Parties*

As noted previously, defendants concede that if Electrolux paid value for this lawsuit, NUE is entitled to maintain it (although they contend that any recovery that would be had under such circumstances would have to be limited to the amount of consideration paid in order to prevent a *Bangor Punta* "windfall"). They maintain, however, that the record shows conclusively that in fact no consideration was paid to the former NUE shareholders for the suit and further that the findings of the appraiser in the Delaware Chancery Court proceedings, which were approved by Chancellor Marvel on April 17, 1980, and which included the finding that "the $28 price paid for the minority interest did not reflect any value in the Japanese lawsuit," *Final Report of the Appraiser* at 13, collaterally estop NUE from contending that extra value was paid for the litigation. They buttress this argument by contending that the position advanced by NUE during the Delaware proceedings and its failure to take exception to the appraiser's findings "judicially" estop it from now being heard to contend that the value of the lawsuit was reflected in the purchase price.

For its part plaintiff submits that Electrolux did pay consideration for the lawsuit (though it does not identify with precision how much consideration) and further states that the finding of the appraiser that this lawsuit had no asset value was based on a

failure of proof on the part of the plaintiff— shareholders. It is asserted that this lapse on the part of the Delaware plaintiffs should not be used to collaterally estop NUE from maintaining that value was paid. Pointing to the deposition testimony and affidavit of Hans Werthen, Executive Chairman of Electrolux, who was primarily responsible for the acquisition, plaintiff posits that the relevant foci for purposes of this motion is what Werthen believed his $28.00 offer included and his calculations of how that figure was arrived at, rather than the Delaware Chancery Court finding, which considered only whether plaintiffs there received fair value for their shares. Notwithstanding defendants' contention that Werthen's affidavit is contradicted by his earlier statements, NUE maintains that the Werthen affidavit and deposition establish that consideration was paid for the lawsuit.

Defendants have supported their motion with a variety of materials, including deposition testimony taken in the present action, the appraiser's report in the Delaware proceeding, the opinion of Chancellor Marvel approving that report, the report of NUE's expert, Dr. Roger F. Murray, submitted in connection with the appraisal proceeding, NUE's brief following the appraisal hearing, and excerpts from testimony taken at that hearing. They have also submitted certain materials relating to an action against NUE and Electrolux and others filed in the United States District Court, Western District of Texas[20] by Marvin and Gerald Lebman, two former shareholders of NUE, and the principal plaintiffs in the Delaware appraisal proceeding. These documents include the complaint and answer and responses by NUE and Electrolux to interrogatories propounded by plaintiffs. The plaintiff's principal submissions consist of the affidavits of Mr. Werthen and of Arthur Dean, Esquire, coexecutor of the estate of C. Russell Feldmann.

*B. Discussion*

Putting aside for a moment the question whether the doctrines of judicial and/or collateral estoppel have application here, we think it plain that the record before us raises a genuine issue of material fact as to whether Electrolux paid consideration for this lawsuit. The affidavits filed by plaintiff in response to this motion standing alone serve to raise the issue.[21]

Mr. Dean's affidavit states that as coexecutor of the estate of C. Russell Feldmann, he was instrumental in the negotiations that led to Electrolux's acquisition of NUE.[22] He avers that he considered Electrolux's initial offer to buy 100% of the NUE stock for $24 per share too low and felt that it "did not fully take into consideration the possibility of a recovery in the *Japanese Electronics Antitrust Litigation. . . .*" *Dean Affidavit* at 3. He further states that in negotiating the tender offer price, he proposed and discussed with Mr. Werthen the possibility of having Electrolux issue certificates of beneficial interest in the antitrust suit to the tendering NUE shareholders, but that Electrolux was unwilling to buy the NUE stock without the lawsuit. *Id.* at 4. Finally, Mr. Dean states that he informed Mr. Werthen that the NUE lawsuit sought damages of some $450,000,000 from the defendants.

---

20. *Lebman v. ASEA*, No. 78–258 (W.D. Texas, filed July 20, 1978).

21. The standards governing the court on a motion for summary judgment are set out at some length in our opinion (1916 Antidumping Act), M.D.L. 189, slip op. at 87 (April 14, 1980), and are here incorporated by reference.

22. The negotiations for the acquisition of NUE by Electrolux proceeded in three phases. Electrolux's initial offer was to purchase a controlling interest in NUE for $30 per share. That offer was rejected because the Feldmann family could not be assured that all of their NUE stock would be purchased unless the buyer agreed to take all the outstanding shares. The second phase of negotiations involved a proposed joint purchase of all NUE stock by Electrolux and Scovill Manufacturing Corporation at $30 per share. That proposal was abandoned when it became clear that the Federal Trade Commission would oppose it. The final phase of negotiations, and the one with which we are here concerned, commenced with Electrolux's offer to buy all the outstanding shares of NUE at $24 per share and concluded with the finally accepted bid of $28 per share.

Two facts relevant to our inquiry emerge from the Dean affidavit. First, it is clear that as executor of the Feldmann estate negotiating to sell its shares and those of other family members, Mr. Dean believed the NUE lawsuit to have value that should either be reflected in the price paid for the Feldmann shares or, alternatively, should be reserved for the benefit of the estate and the family members. Second, it is clear that Mr. Dean communicated to Electrolux both this fact and the opinion of NUE's trial counsel that substantial damages might be recovered in this litigation.

The Werthen affidavit provides further support for the view that the NUE lawsuit was a factor in the negotiating process. Mr. Werthen states that his initial offer to purchase 100% of the NUE stock at $24 per share was based in part on the present litigation. "I was particularly impressed with the possibility that NUE would be successful in the *Japanese Electronic Products Antitrust Litigation.*" *Werthen Affidavit* at 5. He further states that "[w]hile it is impossible to ascertain the amount I considered was added to the purchase price because of the possibility of recovery [in the lawsuit], I did consider this a valuable feature of the acquisition when the decision was made to consummate it." *Id.* at 6.

At oral argument on this motion, defendants made much of Mr. Werthen's failure to identify the exact amount he felt was added to the purchase price for the lawsuit, arguing that such statements as "I considered the lawsuit a valuable feature of the acquisition" and "I was impressed by the possibility of recovery" are insufficient to raise a genuine issue of material fact as to whether consideration was paid for the lawsuit. They note that under Fed.R.Civ.P. 56(e), NUE, in response to defendants' motion, was required to set forth specific facts establishing a genuine issue of fact for trial [23] and contend that the allegations in the Dean and Werthen affidavits are insufficient to meet this standard.

Defendants' argument presumes that in order for there to be a genuine issue of material fact as to whether consideration was paid for this lawsuit, Mr. Werthen would have had to specify the precise dollar amount paid. We do not agree with this presumption, and indeed at oral argument counsel for defendant *Sanyo* conceded that buyers and sellers of corporations will often not separate out in a purchase agreement the distinct assets being acquired and assign a dollar value to each. Though defendants posit that without knowledge of the specific dollar amount paid for the lawsuit, a fact finder could not make a "rational damage award," as we have indicated *supra* at 25, we think any attempt to relate the damage award to the amount of consideration would be to ignore the legal maxim that the law will not inquire into the consideration paid. Thus, the failure of Messrs. Werthen and Dean to identify with precision the dollar amount paid for the lawsuit does not militate against a finding that there is a genuine issue of material fact as to whether consideration was paid. That the lawsuit had no precise or ascertainable value does not mean it had no value at all. We think Mr. Dean's statement that he attempted to retain for NUE's shareholders a beneficial interest in any recovery that might be had here, coupled with Electrolux's refusal to grant that interest and Mr. Werthen's statement that he considered the lawsuit a valuable feature of the acquisition suffice to raise a material factual issue.

This conclusion is buttressed by other materials in the record. At his deposition, Mr. Werthen testified that when his negotiations with NUE commenced, he was thinking of offering a price of $13 or $14 per share because that was the current market price of the stock. He was therefore "shocked" when Mr. Swenson, of First Boston Corporation, suggested a price of $24 or

---

**23.** Rule 56(e) provides in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his re-

sponse, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

$25 per share, since it was Electrolux's practice in buying companies to pay a discounted price (from book value). Werthen was therefore interested and somewhat mollified when the fact of this lawsuit was brought to his attention. *Werthen deposition* at 32. Recovery in the lawsuit would mean that certain "holes" in the balance sheet [24] would be less glaring, *id.* at 71, and would mean that the NUE deal would be more like the typical Electrolux acquisition, where the company is acquired at far below net value. *Id.* at 71. Werthen also testified that with his opening bid of $24 he was seeking only to acquire a controlling interest in NUE (51% of the stock) but that Dean's statements about the lawsuit caused him to change his policy on bidding and attempt to acquire all the shares. *Id.* at 81–84.

In essaying to calculate the value of the lawsuit, Werthen testified, at 141–142, as follows: At the $28 price per share paid the total price of the company was approximately $60 million. The equity of the company, not including the lawsuit was approximately $40 million, less $10 million for the consignment sales of air conditioners and $3 million for the overvaluation of the National Presto stock carried on NUE's books. *See* n.22 *supra*. The resulting $27 million was equal to about $13 per share, which corresponded to the stock market value of the company at the time. While declining to say that the $33 million difference between the price actually paid and the net value of the company was equal to the value of the lawsuit to Electrolux and while admitting that there were other intangibles that went into his calculus (such as the reputation of the company, *id.* at 149, and the fact that NUE like Electrolux was a producer of vacuum cleaners, *id.* at 95) a fact finder could certainly infer from this testimony that the lawsuit was not insignificant or at least was a factor in producing the $28 final bid.

Of course, there is significant evidence in the record that would permit the fact finder to conclude that the lawsuit did not influence the bidding process. As counsel for defendant Sanyo emphasized at argument (and as Werthen has stated several times), Electrolux was extremely interested in reentering the American vacuum cleaner market, having sold its "Electrolux" brand name for use in the United States some years before. Furthermore, it is clear that other companies were also interested in acquiring NUE, and at the appraisal proceeding and in a deposition taken in connection with the Texas lawsuit, Joseph V. McKee, who succeeded C. Russell Feldmann as President and Chief Executive Officer of NUE, testified that prior to Electrolux's $28 bid, NUE had received offers of $27 and $27.75 per share from other suitors. Thus, one could conclude that the $28 bid arose in the heat of competition and that Werthen's statement that Dean's comments about the lawsuit produced it is simply not credible.

Our task here, however, is not to determine which interpretation of the evidence is the correct one. It is merely to determine whether there is a material conflict that would require the evidence to be submitted to a fact finder. As we have indicated, we think the evidence before us raises a material factual issue and that summary judgment is inappropriate at this juncture.

### C. Collateral and Judicial Estoppel

■ Since we have concluded that there is a genuine issue of material fact raised by this record, we must consider whether the findings of the appraiser in the Delaware proceeding, which were approved by Chancellor Marvel, and/or the stance assumed by NUE in that proceeding or in the Texas lawsuit bar NUE from now contending that Electrolux paid for the lawsuit.

In order to answer that question, it is useful to describe in some detail the contours of the Delaware proceeding. As pre-

---

**24.** The "holes" in the balance sheet consisted of approximately $10,000,000 carried as proceeds from the sale of air conditioners, which were in fact sold on consignment and therefore subject to return, and an approximately $3,000,000 overvaluation of National Presto Stock, which was carried at purchase price but which was trading for significantly less.

viously noted, as a result of the June, 1974, tender offer Electrolux acquired 92% of the outstanding NUE shares. On August 1, 1975, the 8% minority interest was eliminated by a freeze–out merger under Delaware law, 8 Del.C. § 253. In December, 1975, a statutory appraisal action was commenced by two minority shareholders in the Delaware Court of Chancery, *Lebman v. National Union Electric Corp.*, 414 A.2d 824, asserting that the $28.00 per share paid to minority shareholders in the freeze–out merger did not represent the fair value of the stock. This contention was based largely on the fact of the present lawsuit, which the shareholders believed increased the fair value per share to $250. *Report of the Appraiser* at 15. According to plaintiffs the entire original damage claim of $360 million should have been included as part of NUE's assets, a position that rested entirely upon trial counsel's opinion that there was a "substantial likelihood of recovery" in the lawsuit.

Thus the task before the appraiser was to determine the "intrinsic" or fair value of the NUE stock at the time of the merger. Predictably, NUE contended that the $28 price per share was a fair price and in support of that position offered the expert testimony and report of Dr. Roger F. Murray,[25] as well as the testimony of Joseph V. McKee, President and Chief Executive Officer of NUE. One of the plaintiffs, Gerald Lebman, also testified, but the plaintiffs offered no expert evidence.

In determining the intrinsic value of the NUE stock, the appraiser used three alternative methods of valuation—market value, asset value, and earnings value, assigning each a percentage weight and adding them together to arrive at the true value.[26] While market value is not alone controlling (and indeed the very existence of the appraisal remedy evidences a legislative intent to provide stockholders with something other than the external market price), the market value is deemed worthy of great weight. The appraiser found the market value immediately preceeding the announcement of merger to be $20.25 per share and assigned market value a weight of 40%. *Id.* at 31. Asset value was found to be $28.42 per share and was assigned a weight of 25%. *Id.* at 25 and 27. The earnings component was found to be $27.54 per share and was given a weight of 35%. *Id.* at 44. Thus the appraiser's calculation of the intrinsic value of NUE stock on August 1, 1975, was as follows:

| Value Element | Value Per Share | Weight | Value |
|---|---|---|---|
| Assets | $28.42 | 25% | $7.11 |
| Market | 20.25 | 40% | 8.10 |
| Earnings | 27.34 | 35% | 9.64 |
| | | | $24.85 |

We set forth this formula because of defendants' emphasis upon the appraiser's conclusion in determining NUE's *asset* value that "the $28 price paid for the minority interest did not reflect any value in the Japanese lawsuit." *Id.* at 13. It is upon this finding that defendants' collateral estoppel argument rests. What defendants have ignored is the appraiser's conclusion in discussing *market* value that the $20.25 price settled upon (and the value given the

---

**25.** Dr. Murray received his Ph.D. in Business Administration from New York University. He has taught courses in security analysis, portfolio management, and capital markets, and was a member of the research staff of the National Bureau of Economic Research. He is a former dean of and is Professor of Banking and Finance Emeritus at the Graduate School of Business at Columbia University. He has provided expert testimony in several major cases involving the valuation of securities.

**26.** The appraiser was guided by the process defined in *Tri–Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del.Sup.1950):

> In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all ·factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

most weight) "tends to fairly compensate plaintiffs for whatever 'loss' in present value they may have suffered on August 1, 1975 from the illusory notion that they have been excluded from participation in any potential recovery from the Japanese lawsuit." *Id.* at 31.

In affirming the report of the appraiser, Chancellor Marvel, although agreeing that it would have been speculative and therefore inappropriate for appraisal purposes to attribute any *specific* value to the pending lawsuit,[27] noted that "of course the mere pendency of such action may have had some effect on the market price of such shares." *Lebman v. National Union Electric Corp.,* 414 A.2d 824 at 826 (Del. Ch. 1980).

In a similar vein NUE's expert, Dr. Murray, testified that one could not say that trial counsel's optimism as to the outcome of the litigation had no effect on the intrinsic value of the stock, *Record of Delaware Appraisal Proceeding* at 216, and further observed that the lawsuit was "part of the totality" (although a small part) of the acquisition. "There is no way I can unravel the interrelationship between this asset [the lawsuit] and the other ongoing elements of value in the company." *Id.* at 218. Similarly, in his report, Dr. Murray, arguing that market price should be given great weight in the appraisal (since "it captures all elements of corporate performance, financial position and prospects, and is the most objective measure of value," Report of Dr. Murray at 13), observed that "buyers

and sellers were aware of NUE's action against the Japanese television companies, and their assessment of the value of that action is reflected in the market price." *Id.*

Thus, while the appraiser, the Chancellor, and NUE's expert all agreed that it would be pure guesswork to attempt to value the lawsuit as an asset, they also all agreed that the *fact* of the lawsuit had an effect on the *market price* of NUE, the factor that was given the greatest weight in arriving at NUE's *intrinsic* value. The conclusion of the court that the litigation was incapable of valuation was not a conclusion that the litigation had no value whatsoever, and concomitantly that Electrolux paid nothing for it. Indeed, the conclusion that the lawsuit's value was reflected in the market price supports NUE's argument that consideration was paid. Whether the consideration was subsumed in $13.00 per share that Mr. Werthen perceived to be the market price (or in the $20.25 per share market price found by the appraiser to have prevailed at the time of merger) or whether it was contained in the $15 per share differential between market and acquisition price is irrelevant for our purposes. The question is was any consideration paid, not how much consideration or which dollars.

To recapitulate, we do not see the appraiser's conclusion that the litigation had no ascertainable *asset* value as being equivalent to a finding that Electrolux did not pay consideration for the lawsuit.[28] We

27. Both the appraiser and Chancellor Marvel relied on the wisdom of the Third Circuit in *In re Universal Lubricating Systems,* 150 F.2d 832, 835 (3d Cir.), *cert. denied sub nom. Stockholders' Committee v. Staley,* 326 U.S. 744, 66 S.Ct. 58, 90 L.Ed. 444, *reh. denied,* 326 U.S. 808, 66 S.Ct. 138, 90 L.Ed. 493 (1945):

> We have not, of course, the faintest notion of the strength of the debtor's case nor the defendant's defense in the forthcoming litigation. The suit has not yet been tried and is still in the preliminary stage. Lawsuits, even those in which a plaintiff endeavors to prove liability up to the hilt, are uncertain things both as to the time which they take and what the end product to the litigant will be.

28. In this regard it is also important to set forth NUE's argument, that the finding of the ap-

praiser was based upon a failure of plaintiffs' proof, an argument that finds support in the appraiser's report, which notes at 15 that the plaintiff's only evidence as to value of the lawsuit was counsel's statement that there was a "substantial likelihood of ... recovery," coupled with NUE's claim for damages of $360 million, plus $13.4 million representing the loss from NUE's discontinued television operations. The appraiser observed that while minority shareholders deserve the benefit of the doubt on valuation questions, "one cannot indulge in gratuitous presumptions lacking any competent evidence of value to support them." *Id.* Viewed from this perspective, the conclusion of the appraiser about the asset value of the lawsuit is somewhat less compelling than it otherwise might be. Presumably, had plaintiff offered expert testimony, the findings might well

therefore do not think the defendants' collateral estoppel arguments have any relevance here, particularly in view of the appraiser's apparent belief that the value of the lawsuit—whatever it may have been in August, 1975—was reflected in the market price, a belief that was echoed by Chancellor Marvel in his approval of the report and espoused by NUE's expert.

The Third Circuit has defined the elements of collateral estoppel as follows: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must actually have been litigated; (3) it must have been determined by a valid and final judgment; (4) the determination must have been essential to the prior judgment. *Haize v. Hanover Insurance Co.*, 536 F.2d 576, 579 (3d Cir. 1976). As we have observed, we do not believe the issue of whether consideration was paid for this lawsuit was either involved in the Delaware proceeding or was litigated there.[29]

Neither do we regard NUE's failure to take exception to the appraiser's report or the stance it assumed in the Delaware proceeding as being inconsistent with the position it here espouses, and thus we do not find this to be an instance where the doctrine of judicial estoppel has application. As defined by the Third Circuit, the doctrine of judicial estoppel essentially provides that where a plaintiff has obtained relief from an adversary by asserting and proving one position, he may not later be heard in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. *Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953).[30]

In the Delaware proceeding, NUE—and its expert—argued that Electrolux had paid *fair* value for the *stock*, not that Electrolux had paid *no* value for the *lawsuit*. Indeed, it was important to NUE's position in the appraisal action for the company to posit that value was paid—but that value was reflected in the market price and could not be calculated separately as consideration for an identifiable part of NUE's assets.

### D. Conclusion

We think the record makes clear that there is a genuine issue of material fact as to whether Electrolux paid consideration for this lawsuit. The affidavits supplied by plaintiff and the deposition testimony of the central figures in the acquisition, as well as the terms of the tender offer and the notice of merger reveal that the lawsuit was employed as a bargaining tool by the sellers and was perceived by the buyers as a feature that at least in some degree made the acquisition more attractive. We do not believe the fact that the lawsuit may be incapable of a precise valuation to be fatal to plaintiff's argument that it went into the

have been different. Given the posture of the Delaware litigation, it would be unfair to saddle NUE with the failure of certain of its former shareholders to come forward with competent evidence. See n. 28 *infra*.

**29.** We add that while mutuality of estoppel is no longer required, at least "'where the prior judgment [is being] invoked defensively in a second action against a plaintiff bringing suit on an issue he litigated and lost as plaintiff in a prior action.'" *Cramer v. General Telephone and Electronics Corp.*, 582 F.2d 259, 267 (3d Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979), it does not automatically follow *i. e.*, without a careful examination of the circumstances, that collateral estoppel can be asserted offensively against a plaintiff who was a successful defendant in the proceeding sought to be invoked, although in view of our determination that the issue was not decided, we need not consider the ramifications of the doctrine of collateral estoppel in these circumstances.

**30.** It is worthy of note that in *Scarano* the court specifically declined to decide whether the broader formulation of judicial estoppel set forth in II Freeman on Judgments § 631 (5th ed. 1925) was correct: "A party to a litigation will not be permitted to assume inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits." Thus, even if we were to decide that NUE's position in the Delaware proceeding is inconsistent with its position here, it is by no means clear that in this circuit the doctrine of judicial estoppel would permit a stranger to the Delaware proceeding to invoke that inconsistency against NUE. *See* 1B *Moore's Federal Practice* ⸤ 0.405[8].

calculus of the final bid, nor do we believe the appraiser's finding that the lawsuit had no asset value to be equivalent to a finding that the lawsuit did not play a role in the acquisition, particularly in light of the apparent agreement among the NUE expert, the appraiser, and Chancellor Marvel that its value was reflected in the market price. While this conclusion may be at odds with Mr. Werthen's perception that the lawsuit had value as an asset for which he was willing to pay some extra if not exactly identifiable amount, it supports NUE's position here that the litigation figured into the final offer. In sum we find that the doctrines collateral and judicial estoppel are not applicable here and do not bar NUE from maintaining that there exists a genuine issue of material fact that must preclude us from granting summary judgment on this motion, even if *Bangor Punta* is deemed the controlling legal precedent on these facts.